COMMONWEALTH *vs*. GARY J. CIFIZZARI.

Worcester. March 3, 1986. — May 14, 1986.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Rape. Unnatural Sexual Intercourse. Felony-Murder Rule. Identification. Evidence,* Dental imprints, Expert opinion. *Practice, Criminal,* Mistrial, Argument by prosecutor. *Constitutional Law,* Confrontation of witnesses. *Joint Enterprise.*

At a murder trial, the testimony of three experts in the field of forensic dentistry, who had made a positive identification from the defendant's dental imprint and bite marks found on the victim's body, was properly admitted upon an adequate showing of the reliability of the procedures used, and the prosecution was not required to establish, as a preliminary matter, that such identification techniques have gained general acceptance in the scientific community. [569-573]

Where, during her testimony at a murder trial, a key prosecution witness referred to a confession by the defendant's brother, the witness's statement, to which defense counsel failed to object, did not, in the circumstances, present a substantial risk of a miscarriage of justice requiring allowance of the defendant's motion for a mistrial, made the following day. [573-574]

At a murder trial there was sufficient evidence to warrant submission of the case to the jury on the theory that the defendant and his brother, who was not tried with him, had jointly participated in the attack on the victim, where the nature of the crime was such that one person alone could not have accomplished it; where there was testimony that, the night after the murder, the two men were together in the town where it had occurred, that the defendant rarely visited the town, and that he had made inconsistent statements to police; and where three dental experts positively identified the defendant's teeth as those which had made a bite mark on the victim's body. [574-576]

Rape committed by unnatural sexual intercourse encompassed penetration by the use of an inanimate object, so as to warrant, in a murder case, an instruction to the jury on felony-murder based on the underlying felony of rape. [576-578]

At a murder trial, certain improper comments by the prosecutor during closing argument, making reference to a matter not in evidence and interjecting the prosecutor's personal beliefs as to the defendant's guilt,

to which no objection was made, did not create a substantial risk of a miscarriage of justice when considered in the context of the entire argument. [578-580]

INDICTMENT found and returned in the Superior Court Department on November 16, 1983.

The case was tried before *Robert J. Hallisey, J.*

*Stephen Hrones* for the defendant.

*Claudia R. Sullivan,* Assistant District Attorney, for the Commonwealth.

NOLAN, J. On the morning of September 29, 1979, seventy-five year old Concetta Sciappa was found dead on her living room floor, as a result of massive internal injuries caused by the insertion of a mop handle into her vagina. Almost five years later, the defendant, Gary J. Cifizzari, the victim's nephew, was tried for and convicted of the murder in the first degree of his aunt. His appeal raises the following issues: (1) Did the judge commit reversible error in admitting expert testimony on bite mark identification evidence? (2) Did the judge commit reversible error in denying a motion for a mistrial when a witness stated that the defendant's brother had confessed to the crime, and where the evidence indicated association between the brothers? (3) Was it error to instruct the jury on the theory of joint venture? (4) Was it error to instruct the jury on felony-murder, which was based on the felony of rape, because (it is argued) rape cannot be committed with an inanimate object? (5) Was the defendant denied a fair trial as a result of several remarks made by the prosecutor in his closing argument? (6) Should the defendant be granted a new trial under G. L. c. 278, § 33E (1984 ed.)? After considering each issue and reviewing the entire record pursuant to our obligations under G. L. c. 278, § 33E (1984 ed.), we affirm the conviction. We outline the evidence as it was presented to the jury.

At approximately 9 P.M. on September 28, 1979, Kathy Terhune, the victim's neighbor, visited the victim for a short while. As she was leaving, she noticed that the victim's back door was slightly open. It was the victim's usual custom to

leave the door ajar for her cats. Terhune's husband arrived home and then left three times during the evening. On the third trip, at about 11 P.M., he saw a shadow in the window of the victim's apartment, and noticed the window shades were half-way up. He thought that this was unusual. He drove around the block. Upon returning to the building he saw that the shades had been drawn. He also noticed that the back door to the victim's apartment was closed.

Ronald and Diane Nydam, who lived in the apartment above the victim, were home on the evening of September 28th. At approximately 11:30 P.M. they heard groans or grunts and the sound of furniture being moved in the victim's apartment. Ronald Nydam went downstairs and out of the building. He could not see into the victim's apartment because the shades were drawn tightly, nor did he hear any noises. Nydam also attempted to look through the keyhole to the victim's apartment but was unable to make any observations. He thought that something was unusual because of the way the shades were drawn.

At 9 A.M., on Saturday, September 29, 1979, Diane Nydam was awakened by the victim's telephone, which rang for a long time. She went downstairs where she found the victim lying on the living room floor. She testified that, "The right side of [the victim's] face was completely bruised. Her dress was up above her waist, and I saw a mop up her private parts." The television was playing, but the volume was turned down. In the kitchen sink there were several dirty dishes from a meal of chicken wings in a red sauce.

The victim had been beaten and her jaw was broken. According to medical testimony, she died as a result of "multiple blunt force injuries and hemorrhage from a penetrating wound, which began in the vagina with a wooden rod penetrating through the internal viscera or organs and palpable in the skin of the right shoulder area." The victim had been alive for several minutes after the insertion of the mop handle. Other bruises were present on the victim's body. There was testimony that two bite marks, one on the abdomen and one on the thigh, were inflicted while the victim was alive. Three experts in the

field of forensic odontology testified at length on the subject of the bite marks. All three stated that the bite mark on the victim's abdomen matched the defendant's dental imprint. He had voluntarily consented to the taking of his dental imprint.[1] Their testimony is reported in further detail in the discussion of the issue of bite mark identification.

The victim's keys and change purse were found on a neighbor's lawn. A thorough search of the victim's apartment revealed cash, savings bonds, and jewelry.

On the evening after the murder, the defendant and his brother[2] visited the defendant's first cousin, Antonetta Pasqualone, who lived in Milford, Massachusetts, the same town in which the victim lived. Pasqualone noticed that their clothes were dirty. The cousin testified that when she looked at the two men she stated: "[Y]ou two goons walking around, they're going to think you did it." Neither the defendant nor his brother responded to her comment. Pasqualone testified that she and her mother washed the men's clothes on the evening of their visit. The two brothers left the following day. Pasqualone also testified that the defendant had visited her approximately five or six times between 1969 and 1979; the last time (prior to 1979) was Christmas of 1976.

The defendant testified that he was at home when he learned of his aunt's murder, that he had stayed home the night before hearing this, and that he and his brother went to Antonetta Pasqualone's house two days after the murder.[3] He denied that

---

[1] Tooth impressions were taken from the defendant. The defendant signed a voluntary consent form after being informed that any evidence derived from the dental imprints could be used against him.

[2] The brother subsequently confessed to committing the murder and he was tried and convicted of murder in the second degree. His conviction was affirmed by the Appeals Court in *Commonwealth* v. *Cifizzari,* 19 Mass. App. Ct. 981 (1985).

[3] The defendant had previously told a police officer that he had not gone to Milford in 1979 but that he had been there in October, 1980. He also stated on a prior occasion that he had heard about the murder at his cousin's house but then corrected himself and said that he had been at his mother's house. During another interview with the police, the defendant denied going to Milford at all in September, 1979, and stated that he was nowhere near the town of Milford on the night of the murder and that he was at home at the time his mother received a telephone call, informing her of the murder.

his clothes had been washed there, and stated that there was no discussion about the murder. He also stated that he did not know where his aunt, the victim, lived.[4]

The defendant's mother testified that the two brothers were at her home when she received the telephone call informing her of the murder, and she also remembered that the defendant had been home on the night of the murder. She previously told a police officer that the defendant and his brother might have been home on the evening of the murder, but that she could not recall with certainty. She also told an officer that the two men were at Pasqualone's house in Milford the night after the murder. We turn now to a discussion of the issues.

1. *Bite mark identification evidence.* A significant part of the prosecutor's case against the defendant consisted of testimony from three experts in the field of forensic dentistry who made a positive identification from the defendant's dental imprint and the bite marks on the victim's body. We need to summarize the experts' testimony in some detail because the major issue raised in this appeal is the admissibility of their opinions and it is a question never before decided in the Commonwealth.

Dr. Stanley Schwartz,[5] a dentist, a professor at Tufts University, and the only State-appointed forensic dentist, testified for the Commonwealth. Much of Dr. Schwartz's work has been in the area of identifying remains of deceased persons. As an initial proposition, he stated that it is a well known fact in dentistry that no two sets of teeth are absolutely alike, or at least, the likelihood of that condition is "infinitesimal."

---

[4] Pasqualone testified that the defendant's brother had gone to the victim's house during a visit to Milford in 1976.

[5] Dr. Schwartz received degrees from Tufts University and Tufts Dental School and received some formal education at Harvard University. At the time of his testimony, he had been a practicing dentist for twenty-five years; two years of that time he spent in the Navy, as a chief oral surgeon in Japan, identifying bodies. He had testified at least seven times in human bite mark cases, and had examined over one hundred bodies. He has authored three chapters in books on forensic odontology and six articles. Dr. Schwartz also has lectured at least one hundred times and studied bite mark cases for at least eight years. We uphold the judge's determination that Schwartz's qualifications rendered him an expert in the area of forensic dentistry.

On September 29, 1979, Dr. Schwartz received a telephone call and went to a funeral home in Milford where he examined the body of the victim. He found the presence of two human bite marks on her body, one on the lower right quadrant of the abdomen and one on the left upper thigh. He photographed them with a fifty-five millimeter macro lens on a Nikon thirty-five millimeter single lens reflex camera. He stated that taking photographs of bite marks was "normal procedure." He also took an "impression" of one bite mark, using rubber base material, which is normally used for taking dental impressions. He testified that the material is capable of taking fine details and is "very accurate impression material." After mixing up the base to manufacturer's specifications he then put it on the abdomen bite mark for five minutes. He next put a plaster of paris ("dental stone") over the rubber-based material to harden it. The doctor testified that the impression showed nothing because the skin was only bruised; the teeth did not break through the skin. He explained that bruising occurs as a result of the fracturing or tearing of blood vessels, and that the blood circulation indicates where the teeth were. He also said that bruise marks will remain on the body for about twenty-four to thirty-six hours. The witness had studied the subject of bruising in his postgraduate program in oral pathology.

Dr. Schwartz took the film to the photographic laboratory of Tufts University Medical School. He instructed a person there to "scale"[6] the film to human size, which is also a procedure that he generally followed in bite mark cases. The doctor also received two sets of impressions of the defendant's teeth from the State Police.[7] He explained that the impressions were taken by using material similar to material that he used in taking the impression of the bite mark. He had taken dental imprints at least one hundred times.

---

[6] The process of "scaling" the film to life size is done by measuring the actual bite mark with a millimeter ruler and using those measurements in the processing of film.

[7] Dr. Peter Juliano had taken the imprints in April, 1983. He was deceased at the time of trial.

Dr. Schwartz next testified about comparisons he made between the dental impressions of the defendant's teeth and the bite marks found on the victim's body. He described the two methods of making these comparisons. One way is to lay the model of the teeth on top of the life-size photograph, and then determine whether the two match. He demonstrated to the jury, using the model of the teeth and the photograph of the bite mark on the abdomen, in which direction the bite was made. He testified that, in his opinion, the six anterior teeth (from eye tooth to eye tooth) conformed to the photograph. He noted that the upper right central tooth was "retrouded."[8] The doctor acknowledged that the defendant's front tooth had been missing at the time the imprint was taken,[9] however, he stated that the root does not normally move. He said that the tooth that had been attached to the root was palatally displaced. On cross-examination, Schwartz testified that it is very difficult for trauma, in combination with the loosening of teeth, to cause relocation of the natural teeth in a human being over a two-year period.

Dr. Schwartz conducted another method of comparison. He laid a piece of acetate (a clear, plastic sheet) over the impression of the defendant's teeth and then drew in the "incisal," the biting surface of each tooth. The doctor then laid a piece of acetate over the photograph of the bite mark on the victim's abdomen and traced it. Using an overhead projector, the doctor next slid the acetate drawing of the defendant's upper teeth onto the acetate drawing of the bite mark to make a comparison. In some detail he described and outlined for the jury the biting surfaces of the defendant's teeth. He also said that the technique

[8] By "retrouded," the doctor explained that the tooth was "palatally displaced," or beyond a certain direction, posterior, to the line of the other teeth. Schwartz testified that in his thirty years of experience, he has rarely seen a tooth in this type of position. He also testified that the impression on the victim's body was made by a tooth that was palatally further backwards in the mouth.

[9] The defendant had lost this tooth during a fight in 1980, after the murder and before the impressions were taken. Just prior to the defendant submitting to the imprints he was treated for a bad back tooth; he was later fitted with a crown for the missing front tooth.

of making these acetates and comparing them is recognized in the field of forensic odontology. Forensic odontology is the application of the science of dentistry to the field of law. In the doctor's opinion, there was a match between the defendant's teeth and the tracings of the bite mark on the victim's abdomen. Specifically, he stated, "The teeth on this yellow model of [the defendant's] upper jaw did make those marks within a reasonable degree of dental certainty."

Dr. Anthony Michael Captline,[10] an oral and maxillofacial surgeon, with whom defense counsel had originally communicated, received photographs from Dr. Schwartz and models from Dr. Souviron (who had received them from Schwartz). He visually examined them and measured them with a millimeter-ruled scale. He took the millimeter measurements of the dentition, "along with axial measurements of the dentition and the general arch shape or form of that study model with the dentition." The result of his measurements was an opinion that "the dental models and the dentition thereon and the bite marks on the photograph thereon matched."

Finally, Dr. Richard Souviron[11] testified for the Commonwealth. His original work in the field of forensic dentistry involved the identification of unknown remains from disasters such as airplane crashes. He became involved in bite mark evidence in 1971-1972, and had worked on several hundred

[10] Dr. Captline was in private practice at four hospitals in the Pittsburgh, Pennsylvania, area at the time of trial. He attended the University of Pittsburgh and University of Pittsburgh School of Dental Medicine, where he spent three years in anesthesia and oral surgery. As a member of the United States Navy from 1968 to 1970, he was chairman of the department of oral and maxillofacial surgery at a United States Naval Hospital. He had been in private practice since 1970 and was an assistant professor of oral maxillofacial surgery at the University of Pittsburgh. He later resigned that position to attend law school.

[11] At the time of trial, he had been a dentist for twenty-four years. His education began at the University of Miami and Emory University. He received a degree in dental surgery from Emory University School of Dentistry. He was involved in the field of forensic dentistry in Florida and in 1967 he became a consultant with the Dade County Medical Examiner's office. He belonged to several dental organizations and societies concerned with forensic odontology.

cases prior to the time he testified in this trial. He had also testified at least thirty-five or forty times in Florida. Eight or nine times he testified on behalf of defendants.

Dr. Schwartz requested Dr. Souviron to review the photographs and the models and render an opinion. In detail, Dr. Souviron explained that initially he analyzed the bite under magnification and also microscopically in an attempt to pick up any details that might appear in the wound pattern. He also examined the models of the defendant's teeth in the same fashion, by using an acetate tracing of the teeth. In addition, he made a wax imprint of the teeth. The doctor then compared the acetate, the wax imprint, and the actual model to the photograph of the bite mark. He testified that what he did on this case was "pretty much standard" procedure.

Dr. Souviron had another person construct enlarged photographs of the models of the defendant's teeth. He also marked with numbers each tooth, on a clay indentation of the teeth, and he transferred the same marks to a photographic enlargement of the bite mark on the victim's abdomen. He demonstrated how he literally held the upper set of teeth over the photograph of the bite mark and then examined it. He discussed, in particular, one tooth with dips and chips as corresponding with the bruise. As to the bite mark on the victim's thigh, the doctor noted that there were seven similar "points of identification" between the mark in the skin and the area on the tooth that could have made the mark. In Dr. Souviron's opinion, "The teeth of [the defendant] were the teeth that inflicted both bite wounds."

Defense counsel, on cross-examination, elicited from the doctor a response that some distortion can occur in the photographic process if the bite mark is not in the proper plane in orientation with the ruler. He noted, as did Dr. Schwartz, the importance of maintaining the integrity of the X-ray process. He also agreed that the same teeth may make different bruise marks because of such factors as change in blood pressure and elasticity of skin. He agreed with the statement that different teeth do not necessarily make a mark in the degree of severity

in direct relationship to their relative lengths, and that it has been documented that some teeth in the mouth will not leave marks in certain wounds.[12] We now turn to a discussion of the issue.

There can be no doubt that this evidence was damaging to the defendant as it identified him as the one who bit the victim and also placed him at the scene of the murder. The defendant contends that the admission of the experts' opinions created reversible error, and that they should not have been allowed to render their opinions because no foundation was laid to demonstrate that bite mark identification techniques have gained acceptance in the scientific community.[13] We reject this contention because the admissibility of bite mark evidence does not depend on such a general acceptance.

The defendant's argument is based on a principle articulated in the leading case of *Frye* v. *United States*, 293 F. 1013, 1014 (D.C. Cir. 1923), which held that "[j]ust when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." This

---

[12] We also acknowledge that defense counsel elicited from all three experts the fact that none had ever personally examined the defendant's teeth. Only Dr. Schwartz examined the actual bite marks.

[13] The defendant objected several times throughout the testimony of the three expert witnesses. When asked by the judge the basis for his objection, he indicated that there had been no showing as to the acceptance of this type of identification procedure in the scientific community. The judge then responded that he was not sure that expert testimony was even necessary in order to make the comparisons. We also note, however, that on a few occasions, the defendant stated that his grounds for objecting were based on the "technical expertise" of the witness. We conclude that the objection to this evidence was made solely on the basis of its admissibility and not on the qualifications of the experts or on any other basis.

court has applied the *Frye* principle in several cases. In *Commonwealth* v. *Fatalo*, 346 Mass. 266, 269 (1963),[14] and in *Commonwealth* v. *Vitello*, 376 Mass. 426, 441-442 (1978), we applied the *Frye* test in considering the admissibility of polygraph evidence. In *Commonwealth* v. *Lykus*, 367 Mass. 191, 204 (1975), where voiceprint identification evidence was in question, this court determined, as a preliminary matter, after examining relevant decisions, scientific writings, and the nature of the scientific machine involved, that such identification procedures had been accepted in the scientific community. We applied *Frye* principles in ruling that hypnotically induced testimony is not admissible. *Commonwealth* v. *Kater*, 388 Mass. 519 (1983). See *Commonwealth* v. *Beausoleil, ante* 206, 216 (1986) (HLA tests generally accepted as reliable).

In two cases involving circumstances closely analogous to those now before us, we have rejected the applicability of *Frye*. In *Commonwealth* v. *Devlin*, 365 Mass. 149, 155 (1974), an expert made comparisons of pre-mortem and post-mortem X-rays of bones of a human body. He testified that no two persons have identical bone structures. We regarded his opinion not as a "scientific theory" but as the product of years of experience in viewing X-rays. We noted that the comparison testimony by the expert served to lend assistance to the jury in interpreting the physical evidence. We also observed that, in the Commonwealth, the history of the admission of medical experts' opinions undermined the defendant's assertion that "general acceptance" is a prerequisite to the admissibility of those opinions. *Id.* In *Commonwealth* v. *Gilbert*, 366 Mass. 18, 24-25 (1974), we affirmed our holding in *Devlin, supra.* Recently we cited the *Devlin* case in stating that this court has not "utilized the *Frye* test to preclude the admissibility of novel scientific techniques or information developed by a particular expert witness utilizing accepted scientific instruments or theories." *Commonwealth* v. *Beausoleil, supra* at 215 n.11.

---

[14] In *Fatalo, supra*, we also recognized the applicability of the acceptance test to the issue of the admissibility of blood tests to determine nonpaternity. See *Commonwealth* v. *Stappen*, 336 Mass. 174, 176 (1957).

See also *Commonwealth* v. *Weichell*, 390 Mass. 62, 83 (1982) (Liacos, J., dissenting), cert. denied, 453 U.S. 1038 (1984) ("composite" drawings should not be subject to the restrictions of *Frye*).

The admissibility of expert dental witnesses' testimony does not depend on meeting the *Frye* test. The experts' testimony merely aided the jury in comparing the photographs of the bite marks with the defendant's dental impressions. The judge, in expressing his position that perhaps expert testimony was not necessary on the subject, reached the core issue which is that bite mark evidence is merely a valuable tool to the jury in understanding and interpreting the evidence.[15]

Other jurisdictions that generally follow the principles of the *Frye* test have reached the same conclusion that we have concerning the admissibility of expert testimony concerning bite marks. See *Bundy* v. *Florida*, 455 So.2d 330, 349 (Fla. 1984) (bite mark evidence differs from breathalyzer tests, radar, and polygraph tests as those techniques involve total reliance on scientific interpretation to establish a question of fact). Accord *People* v. *Marx*, 54 Cal. App. 3d 100, 111 (1975) ("in making their painstaking comparisons and reaching their conclusions, the experts . . . applied scientifically and professionally established techniques — X-rays, models, microscopy, photography — to the solution of a particular problem which, though novel, was well within the capability of those techniques"); *People* v. *Milone*, 43 Ill. App. 3d 385, 397 (1976) (expert testified that in his opinion every person's dentition is as distinct as his fingerprints; identification by matching

---

[15] This case is different from *Kater, supra,* where we held that the *Frye* test must be met as a prerequisite to admitting hypnotically aided testimony. We stated that "[t]he basic question is not so much whether the process is scientific but rather whether a jury can realistically evaluate the effect of hypnosis." *Kater, supra* at 526. We reasoned that a jury could not do so in that case in light of the vast number of experts who did not generally accept the reliability of hypnosis as a method of refreshing recall. *Id.* at 527. In this case, it is clear that most, if not all, jurisdictions facing the issue have ruled in favor of admitting bite mark identification evidence based on its reliability. We are not departing from *Frye,* because we recognize the importance of establishing scientific reliability of new theories. We simply rule that *Frye* is not here applicable.

dentition to bite mark found at scene is a "logical extension of [this] accepted principle"). *Niehaus* v. *State*, 265 Ind. 655, 661, cert. denied, 434 U.S. 902 (1977) ("The method of identification utilized here . . . is simply a matter of comparison of items of physical evidence to determine if they are reciprocal"). *State* v. *Middleton*, 54 N.Y.2d 42, 50-51 (1981) (expert testified that "teeth have unique characteristics of arrangement, shape, angle and size, and . . . the odds against the characteristics found identifying [the] defendant being duplicated in any other persons's mouth were 'astronomical'"). *State* v. *Temple*, 302 N.C. 1, 11-12 (1981) (evidence admissible where experts applied scientifically established techniques of dentistry and photography). Annot., 77 A.L.R.3d 1122 (1977 & 1985 Supp.).

An important case decided by the California Court of Appeal in *People* v. *Marx, supra*, held that the determination of general acceptance of bite mark identification in the scientific community goes to the *weight* rather than admissibility of the evidence. Accord McCormick, Evidence, § 203, at 609 (3d ed. 1984). The court in *Marx, supra*, was more concerned with the basic data upon which the experts based their conclusions and whether those data were verifiable. The court upheld the admissibility of the expert's testimony because the experts applied scientifically proven methods such as X-rays, models, microscopy, and photography. *Id.* at 111. Our reasoning in *Devlin, supra*, and support by cases from other jurisdictions, leads us to conclude that, in order to admit bite mark identification evidence, including an expert opinion that no two people have the same bite mark, a foundation need not be laid that such identification technique has gained acceptance in the scientific community. What must be established is the reliability of the procedures involved, such as X-rays, models, and photographs. *People* v. *Marx, supra*. Accord *People* v. *Bethune*, 105 A.D.2d 262, 267 (N.Y. 1984).

As we have said, Dr. Schwartz testified extensively as to the reliability of the procedures used. He stated that the methods of taking imprints of the teeth and of the bite mark, the taking of photographs, and the tracing on acetate paper, are all stand-

ard procedures utilized in bite mark cases. It was open to defense counsel to impeach the doctors as to the methods used. Defense counsel raised the issue that skin elasticity, blood pressure, and plane variations, as affecting the photographs, could have some effect on the reliability of the doctor's ultimate conclusions.

2. *Statement regarding the defendant's brother's confession.* During cross-examination of a key prosecution witness, defense counsel asked the witness about a time when she spoke to a detective about the murder. She replied, "I think it was after Michael made the confession." (Michael is the defendant's brother). Defense counsel did not request that this response be struck with curative instructions, did not seek a side bar conference on the matter, and did not make an issue of the statement until the following day when he sought a mistrial.[16] We hold that no substantial risk of a miscarriage of justice resulted from this statement, which was heard by the jury. Therefore, the judge did not abuse his discretion in denying the motion for a mistrial. See *Commonwealth* v. *Early*, 349 Mass. 636, 637 (1965).

The substance of the brother's confession was not in evidence nor did the witness mention the defendant's name with regard to the confession. Cf. *Commonwealth* v. *Moran*, 387 Mass. 644, 653 n.4 (1982). We recognize though that a statement which does not plainly refer to a codefendant may nevertheless be inculpatory if the codefendant could easily be connected with the statement. *Commonwealth* v. *LeBlanc*, 364 Mass. 1, 8 (1973). Here, the defendant contends that because evidence was introduced by the Commonwealth on the theory of joint venture and the evidence associated the defendant with his brother Michael,[17] the statement that his brother confessed vio-

---

[16] Furthermore, that afternoon, defense counsel wanted to meet with the judge to discuss scheduling matters and did not bring up the subject of this witness' response. We note that appellate counsel was not defense counsel at trial.

[17] The defendant had previously moved for a mistrial when a newspaper article concerning his brother's conviction of second degree murder in this case was published one evening during the trial. We must assume that the jury heeded the judge's instructions not to read any material in newspapers

lated his constitutional right to confrontation as recognized in *Bruton* v. *United States*, 391 U.S. 123 (1968). We disagree. The defendant was not on trial with his brother, nor was there any evidence before the jury that the brother had been tried and convicted of the murder. It was perfectly acceptable for the Commonwealth to present evidence on the theory of joint venture to the jury.

Defense counsel should have objected immediately to the witness' response and asked that it be struck with curative instructions. However, his failure to do so was not fatal to the defense, nor did it create a substantial risk of a miscarriage of justice. *Commonwealth* v. *Garcia*, 379 Mass. 422, 439 (1980). As pointed out by the Commonwealth, the confession of one person could have cast doubt on the defendant's guilt. There was also evidence that the police interviewed another person, Robert Cananzey, with regard to the murder. This case is similar to *Commonwealth* v. *Bourgeois*, 391 Mass. 869, 880 (1984), where a defendant at trial stood up and said to his codefendant's attorney, "Now hear me, and hear me good. . . . We're all in this together." This court upheld the judge's denial of the motion for a mistrial. As in *Bourgeois, supra* at 881, quoting *Dutton* v. *Evans*, 400 U.S. 74, 87 (1970), the present case "does not involve the use, or misuse, of a confession made in the coercive atmosphere of official interrogation." Instead, the statement was "merely a spontaneous outburst." *Bourgeois, supra* at 882. "The trial judge was in the best position to judge the prejudicial impact of the statement." *Id.* He did not render any curative instructions because counsel, the following day, sought only a mistrial.

3. *Theory of joint venture.* The defendant next argues that there was insufficient evidence to submit the theory of joint

_____

regarding this case. *Commonwealth* v. *Stone*, 366 Mass. 506, 513 (1974). We further note no prejudice resulted from the fact that the exhibits in the case had tags attached to them bearing the name of the defendant's brother. The jury were fully instructed to disregard the tags. Although the prosecutor stated in his opening that tooth impressions of both the defendant and his brother were given to the doctor, and that one doctor would testify that the brother did not make the bite marks, the judge would not allow in evidence any reference to the brother's imprint.

venture to the jury. We note that at trial he did not challenge the particular instructions that were given, but only challenged the fact that they were given.[18] *Commonwealth* v. *Bongarzone*, 390 Mass. 326, 346-347 (1983).

There was evidence which, if believed, would permit the jury to find that the defendant and another were engaged in a "common design [or] joint enterprise" in the events which resulted in the death of the victim. The jury heard that the detective talked to the defendant's brother *and then* to the defendant (on the same day)[19] and that the two men were together in the town where the murder occurred the night after it happened. The nature of the crime itself lends support to the theory that more than one person committed the murder because one person alone could not have accomplished it. See *Commonwealth* v. *Dyer*, 389 Mass. 677, 682 (1983). There was a bloody pillow found lying across the victim's arm which could give rise to an inference that someone had covered her mouth during the heinous ordeal. The fact that the defendant and his brother were not tried together does not render the instruction improper. *Commonwealth* v. *Dabrieo*, 370 Mass. 728, 745 (1976).

The jury could have found that the defendant actively participated in the attack, or at least placed himself in a position to render aid or encouragement to the active participants. *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980). Although we recognize that association with persons who have committed a crime does not justify an inference that one had participated in the crime, the evidence here indicated more. Cf. *Commonwealth* v. *Fancy*, 349 Mass. 196, 200 (1965). Direct evidence

---

[18] Moreover, the parties discussed the issue of joint venture before closing arguments and instructions. Defense counsel had suggested that it might be improper for the prosecutor to argue that the defendant alone committed the murder because of the brother's conviction. Defense counsel also requested an instruction on assault and battery, indicating that he wanted the jury to consider that perhaps the defendant was present during the murder but that he lacked the requisite mental intent to commit murder and committed an assault and battery only by biting the victim.

[19] We note that no motion to strike was made when this testimony was elicited from the witness.

is not required. *Casale, supra.* The defendant was present in Milford the day after the crime was committed, a place where he had only visited five or six times in the previous several years. When mention of the murder was made, the defendant said nothing. The defendant told inconsistent stories to the police about where he was when he learned of the murder and about when he had gone to Milford. More significantly, as discussed in the first part of this opinion, three dental experts positively identified the defendant's teeth as those which made at least one bite mark on the victim's body. The evidence was more than sufficient to demonstrate active participation in the crime which extended beyond mere presence at the scene or association with another person. Moreover, contrary to the defendant's assertions on appeal, the instructions were sound and emphasized the elements of active participation in a common scheme that the jury were required to find.[20] See *Commonwealth* v. *Blow*, 370 Mass. 401, 407 (1976). Therefore, we find no error.

4. *Instruction on felony murder.* We find no merit to the defendant's contention that the judge erred in charging the jury on felony murder based on the underlying felony of rape. General Laws c. 265, § 22 (1984 ed.) defines rape as natural or unnatural sexual intercourse with a person against his will. The defendant insists that a rape cannot be committed by means of an inanimate object. However, without actually holding to the contrary, we have observed otherwise. In *Commonwealth* v. *Gallant*, 373 Mass. 577, 584 (1977), we held that " 'unnatural sexual intercourse' must be taken to include oral and anal intercourse, including fellatio, cunnilingus, and other intrusions of a part of a person's body or *other object* into the genital or anal opening of another person's body" (emphasis added). Accord *Commonwealth* v. *Mamay*, 5 Mass. App. Ct. 708, 710 (1977) ("unnatural sexual intercourse" includes penetration with hand or fingers). Moreover, in *Gallant, supra* at

[20] The defendant, in his brief, has attempted to read the judge's charge piecemeal and out of context in arguing that it contained errors. Reading the charge on joint venture in its entirety we hold that the judge accurately defined the elements.

590 n.17, quoting Susan Brownmiller, Against Our Will 424-425 (1975), we noted that "while the penis may remain the rapist's favorite weapon, his prime instrument of vengeance, his triumphant display of power, it is not in fact his only tool. *Sticks, bottles and* even *fingers* are often substituted for the 'natural' thing" (emphasis added). See also *State* v. *Cain*, 28 Wash. App. 462, 464 (1981) (statute included "inanimate objects"; court ruled that "fingers" were included in this definition); *C.M.* v. *State*, 680 S.W.2d 53 (Tex. App. 1984). Cf. Model Penal Code § 213 (1974) (defines "deviate" sexual intercourse as "sexual intercourse per os or per anum between human beings who are not husband and wife, and any form of sexual intercourse with an animal").

We recognize that not all jurisdictions agree with our ruling that rape committed by unnatural sexual intercourse encompasses penetration by the use of inanimate objects. See generally 65 Am. Jur. 2d Rape § 3 (1972) ("The actual penetration of the female *sex organ* by the *male sex organ* is required as an element of rape"); Annot., 76 A.L.R.3d 163, 188-192 (1977 § 1985 Supp.) (discusses courts which rule that entry must be accomplished by male sexual organ). See, e.g., *State* v. *Hughes*, 104 Ariz. 535, 537 (1969). We note that many cases cited in the various treatises involve the interpretation of State statutes. General Laws c. 265, § 22, and G. L. c. 277, § 39 (1984 ed.), have broadly defined the crime of rape. In *Gallant, supra* at 584, we clearly included "other object[s]" in our interpretation of "unnatural sexual intercourse." We see no reason to retreat from this position. The evidence was more than sufficient in this case to warrant a finding of rape. No objection was made to the felony-murder charge, and the judge was correct in instructing on the theory of felony-murder.

Moreover, the case was submitted to the jury on all three forms of first degree murder: murder committed with deliberately premeditated malice aforethought, murder committed with extreme atrocity or cruelty, and felony-murder. The evidence was overwhelming to sustain a conviction of murder in the first degree based on extreme atrocity or cruelty and deliberate premeditation. The medical examiner stated that the vic-

tim's jaw had been broken while she was still alive. One doctor testified that in his opinion at least one bite mark was made while the victim was alive and there was testimony that she lived for several minutes after the mop handle was inserted into her body. The shades were tightly drawn in the victim's apartment; the television set was turned down, thus, indicating some deliberate thought.

5. *Prosecutor's remarks in closing argument.* Finally, the defendant assigns as error prejudicial remarks made by the prosecutor in his closing argument. We first address those contested comments about facts not in evidence.

The prosecutor made reference to the defendant and his brother smoking marihuana under a bridge after committing the murder. The prosecutor also stated that "[h]e [the defendant] wants to say to you . . . that he isn't the one that heard the screams . . . her yelling for help . . . saw her turning down the television set . . . ." From our review of the record, there clearly was no evidence of anyone smoking marihuana. In fact, the reference about smoking marihuana, in all likelihood, was taken from the brother's confession, which was not in evidence. See *Commonwealth* v. *Hoppin*, 387 Mass. 25, 28-30 (1982). The prosecutor should have refrained from referring to matters in his closing argument that were not in evidence, and once again we remind counsel to avoid making such errors. See *Commonwealth* v. *Earltop*, 372 Mass. 199, 204-207 (1977) (Hennessey, C.J., concurring). However, the defendant failed to object to any part of the prosecutor's closing. Therefore, our review is limited to whether a substantial risk of a miscarriage of justice has occurred. We hold that it has not.

The questionable remarks about smoking marihuana merely placed the defendant and his brother together after the crime, which was a theory put forward by the Commonwealth through the defendant's cousin, Pasqualone. Moreover, the judge corrected any possible error by instructing the jury that arguments of counsel were not evidence.[21] Cf. *Commonwealth* v. *Burke*,

---

[21] The defendant challenges the judge's comment: "[T]hat . . . [the prosecutor's suggestion] is probably speculation. I do not see how you can arrive at that conclusion based on the evidence . . . but I don't want to

373 Mass. 569, 576-577 (1977). The remarks referring to the victim's screams and turning down the television set were arguable inferences from the evidence that was presented to the jury. See *Earltop, supra* at 205. A bloody pillow was found lying across the victim's arm. Neighbors upstairs heard grunts and furniture moving, and when one went downstairs he heard nothing. The jury could have inferred that the defendant had muffled the screams of the victim. "Counsel has the right to argue inferences from the evidence favorable to his case, and the precise form should not control unless it tends to lead the jury to an improper inference not from the evidence but from the apparent personal knowledge of the attorney." *Commonwealth* v. *Nordstrom*, 364 Mass. 310, 315 (1973).

We agree with the defendant's assertion that the prosecutor improperly interjected his personal beliefs as to the defendant's guilt, and as to the credibility of the expert witnesses.[22] It is a long-standing rule in this Commonwealth that prosecutors may not proffer their personal beliefs to the jury. *Commonwealth* v. *Sherman*, 294 Mass. 379, 391 (1936). S.J.C. Rule 3:07, DR 7-106 (C)(4), as amended, 382 Mass. 787 (1981); S.J.C. Rule 3:08, as appearing in 382 Mass. 797 (1981). "To permit counsel to express his personal belief in the testimony . . . would afford him a privilege not even accorded to witnesses under oath and subject to cross-examination. Worse, it creates the false issue of the reliability and credibility of counsel." *Commonwealth* v. *DeChristoforo*, 360 Mass. 531, 547 (1971), quoting *Greenberg* v. *United States*, 280 F.2d 472, 475 (1st Cir. 1960). The absence of an objection is important here because the judge was not given an explicit opportunity to correct the error. See *Commonwealth* v. *Earltop*, 372 Mass. 199, 203 (1977). We have reviewed the entire record and rule that the few comments, taken in the context of the entire argu-

---

invade your area." We hold that this slightly equivocal statement by the judge did not detract from his charge that arguments are not evidence.

[22] Specifically, the prosecutor made the following objectionable remarks: "This is the guy that caused the bite." "He's the guy that was there. . . . The experts aren't wrong." "He's [the doctor] just telling the truth. The right front tooth was retrouded and that's the truth."

ment, did not create prejudicial and reversible error. *Id.* at 204. See *Commonwealth* v. *Tuitt,* 393 Mass. 801, 810-812 (1985).

6. *Review under G. L. c. 278, § 33E.* The defendant contends that the weight of the evidence requires us to exercise our powers under G. L. c. 278, § 33E, and order a new trial.[23]

General Laws c. 278, § 33E, "consigns the facts as well as the law to our consideration, gives us the power and duty exercised by a trial judge on a motion for a new trial, and requires us to consider the whole case broadly to determine whether there was any miscarriage of justice. . . . If upon our examination of the facts, we should, in our discretion, be of opinion that there was a miscarriage of justice in convicting the defendant of murder in the first degree, and that a verdict of guilty of murder in the second degree or of manslaughter would have been more consonant with justice, it is now our power and duty so to declare." *Commonwealth* v. *Williams,* 364 Mass. 145, 150 (1973), quoting *Commonwealth* v. *Baker,* 346 Mass. 107, 109 (1963). "[W]e must consider whether the verdict of murder in the first degree was against the weight of the evidence considered in a large or nontechnical sense." *Commonwealth* v. *Almon,* 387 Mass. 599, 604 (1982). Nevertheless, "[w]e do not sit as a second jury to pass anew on the question of the defendant's guilt." *Commonwealth* v. *Reddick,* 372 Mass. 460, 464 (1977).

The circumstances in the present case warranted a finding by the jury that a deliberately premeditated murder or a murder by extremely cruel or atrocious means or a murder in the commission of the felony of rape was committed by the defendant. As G. L. c. 278, § 33E, requires, we have examined the entire case and we conclude that the interests of justice do not warrant the entry of a verdict of a lesser degree of guilt or an order for a new trial.

*Judgment affirmed.*

---

[23] We note that the defendant requests only a new trial. However, under G. L. c. 278, § 33E, we are obligated to review the evidence and direct the entry of a verdict of a lesser degree of guilt if we see fit.