STATE OF CONNECTICUT *v.* ANTHONY J. BORRELLI
(14571)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and KATZ, Js.

---

Argued June 4—decision released August 10, 1993

*Carl D. Eisenman,* public defender, for the appellant (defendant).

*Judith Rossi,* assistant state's attorney, with whom were *Frank S. Maco,* state's attorney, and, on the brief, *Michael Brandt,* legal intern, for the appellee (state).

BERDON, J. The defendant, Anthony J. Borrelli, raises two issues on appeal: (1) whether the trial court improperly admitted a prior inconsistent statement of the victim for substantive purposes; and (2) whether the trial court improperly allowed expert testimony on battered woman's syndrome for the purposes of impeaching the victim's trial testimony and providing a possible explanation for her recantation.

The defendant was charged in an information with kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A), assault in the second degree in violation of General Statutes § 53a-60 (a) (2), criminal mischief in the third degree in violation of General Statutes § 53a-117 (a) (1) (A), unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a), and threatening in violation of General Statutes § 53a-62 (a) (1). He was also charged with breach of the peace in violation of General Statutes § 53a-181 (a) (1). The defendant pleaded not guilty to all charges and elected a jury trial. Prior to trial, the defendant filed a motion to dismiss all charges, except for the breach of the peace charge, on the ground that there was insufficient evidence.[1] The trial court denied the motion after a full evidentiary hearing and consolidated all charges for trial. After a jury verdict of guilty on all charges, the defendant was sentenced to an effective term of imprisonment of twenty years, suspended after ten years, with five years probation. The defendant appealed to this court pursuant to General Statutes § 51-199 (b) (3). We affirm the judgment of the trial court.

[1] At the hearing on the motion to dismiss, the defendant argued that there was insufficient evidence to bring the charges to trial due to the victim's recantation and stated unwillingness to testify at trial. The motion was denied by the trial court, *Susco, J.,* on the ground that the victim's prior inconsistent statement was more credible than her testimony at the hearing. The admissibility of the prior inconsistent statement is an issue before this court in the present appeal.

The following evidence was presented at trial. On December 30, 1990, the victim, the wife of the defendant, accompanied by three of her children, went to the Torrington police department in the evening hours and spoke to police officer Dale Olofson. She gave Olofson a written statement alleging that the defendant had physically abused and detained her the previous evening.[2] She read and signed the statement. Her statement reveals the following: The defendant smoked some cocaine in the late evening hours of December 29, 1990, and then began accusing her of cheating on him. He cut up her clothing, underwear, driver's license and social security card with a knife. He held a pillow over her face so she could not breathe, and then tied her hands and feet together with rope behind her back. While she was bound, he threw a knife into the bed-

---

[2] The relevant portion of the victim's prior written statement is as follows: "I got home a little after 11 p.m., about 11:10 on December 29, 1990. I went into the house and the phone rang. Anthony, my husband, was on the phone and he asked if I could pick him up at the Midway Cafe. I did that. We went to Stop & Shop to get groceries and went home. Anthony had some cocaine on him. He smoked it in the house. I pleaded with him not to do it because he gets so crazy. He didn't have a large amount, someone gave it to him. I had gotten a detox prescription for his heroin addiction and I knew the cocaine would not be good for him. I showered and we started watching T.V. We went to bed and he began to accuse me of cheating on him. It was probably about 3 [o'clock] in the morning. He started cutting up my clothes, underwear and things with his knife. He took things out of my pocketbook and cut up my license and social security card because they have my maiden name on them and not his name. He said he was going to tie me up and I said not to. He took a pillow and put it over my face. I couldn't breathe. I gasped for air. He let me go and took a rope and tied my hands and feet together behind my back. It hurt. He kept putting the knife on my mouth and chest while he sat on my chest and put his knees on my arms. He said he was going to kill me. He cut the top of my lip and the bottom of my lip with the knife. He kept saying he was going to kill me and my family, my two daughters and two sons. He got up, said it didn't matter if he goes to jail—it's all over now, and no matter how long he was going to jail for he would get out and kill us. He also put a lighter near my genital area. It got hot. I don't think it burned.

"While I was still tied on the bed he started throwing the knife into the walls of the bedroom. There are some holes in the walls from it. He had

room walls a number of times. He repeatedly threatened to kill her and members of her family, cut her lips with a knife, and held a cigarette lighter near her genital area. At approximately 6 a.m., he released her by cutting the ropes with a knife, and ordered her to give him a ride to Waterbury to buy drugs. They returned at 9 or 9:30 in the morning. She was tired but he would not let her sleep. He also would not let her cancel dinner plans they had made, so she began cooking.[3]

At the hearing on the motion to dismiss, the victim testified that the events alleged in her statement had not happened. At trial, she again recanted. During cross-examination by the defendant at trial, she testified for the first time that it was actually she who had tied up and physically abused the defendant. She also

a lit cigarette which he threw on the bed. It landed next to me. I thought the bedsheets would catch fire. He then said 'I missed you,' picked up the cigarette and put it on my chest. I moved and it rolled off of me. He came to bed and pushed me over while I was still tied. I tried to talk to him and he kept calling me names like cocksucker and douche bag.

"He said the only reason he was keeping me alive was because he wanted me to give him a ride to Waterbury to buy drugs. Then he rested while I was still tied. At about 6 or 6:30 in the morning he cut the ropes with the knife and nicked the back of my right thigh. I didn't see it—it felt like a cut. Anthony said I had five minutes to get dressed and give him a ride which I did. . . . We got back home about 9 or 9:30 in the morning. I tried to sleep—he wouldn't let me. When he did the dope he calmed down, but he didn't want to sleep and he wanted me awake also.

"I got up and vacuumed the bedroom because he threw a glass of wine the night before and it broke. I started to cook for dinner. He wouldn't let me call my mother to cancel. My daughters and son arrived and he finally calmed down about noon today. . . ."

[3] The following evidence was presented in support of the breach of the peace charge. A neighbor of the victim's testified that on April 9, 1991, he looked out his window and saw the victim and the defendant arguing loudly on the street. When he was not looking, he heard a woman yell for help and called 911. He looked out the window again and saw the defendant block the victim as she tried to get into her car. He then saw the defendant push the victim up against another car, with his hands around her face and neck area. Police officers arrested the defendant, who was crouching down behind the stairs leading into the house. Both officers testified that the victim had red marks on her neck.

testified that she had made up her initial story in the hopes that the defendant would be arrested and given drug treatment.

I

The defendant's first claim is that the trial court improperly admitted into evidence for substantive purposes the victim's written, sworn statement to the police, in which she had described in detail the physical abuse that the defendant had inflicted upon her that morning. At trial, the victim was called as the state's first witness. She testified that on December 30, 1990, she had gone to the Torrington police department and had met with Olofson. She gave a statement to Olofson, which she signed after it was reduced to writing. She testified that the words in the statement were the words that she had spoken to Olofson.

Next, the victim was asked by the state's attorney if the words in her statement were "the truth as to what took place between you and your husband on December 30, 1990." She responded that the statement was not accurate. After questioning the victim as to some of the specific facts contained in her statement,[4] the state offered the statement into evidence. The trial court admitted the statement for both impeachment and substantive purposes pursuant to *State* v. *Whelan,* 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

In *Whelan,* we adopted an exception to the hearsay rule allowing the substantive use of a prior inconsistent written statement of a nonparty witness if the declarant: (1) signed the statement;[5] (2) had personal

---

[4] For example, the state's attorney asked the victim if she was telling the truth when she told Olofson that the defendant had tied her up on December 30. The victim testified: "It's the truth that I told her that, but it's not the truth that it happened."

[5] Our holding in *State* v. *Whelan,* 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), sets forth the criteria

knowledge of the facts set forth in her statement; and (3) testifies at trial and is subject to cross-examination. Id., 749; see *State v. Buster,* 224 Conn. 546, 556, 620 A.2d 110 (1993). We reasoned that prior inconsistent statements made under circumstances providing a reasonable assurance of reliability should be admitted to advance the truth finding function of the jury. *State v. Whelan,* supra, 748–53.

The defendant argues, however, that the statement should have been excluded because the particular circumstances of this case undermine the reliability of the victim's prior inconsistent statement. Specifically, the defendant argues that in *Whelan,* the homicide eyewitness' claimed inability to remember the incident in question established the foundation for the admission of his prior statement. The defendant argues that *Whelan* is limited to this context, and does not stand for the proposition that the written statement of a victim who later asserts that the statement is not true is admissible for substantive purposes. We disagree.

It is true that the witness in *Whelan* testified in court that he was unable to remember the event because he had been intoxicated at the time and because he had been in an automobile accident that had left him in a coma. Id., 746. Our analysis in *Whelan,* however, did not focus on the circumstances surrounding the witness' statements in the courtroom. Rather, we carefully examined the circumstances surrounding the out-of-court statement, in order to determine if the statement was made under conditions providing a reasonable assurance of reliability. Id., 754; accord *State v. Alvarez,* 216 Conn. 301, 314, 579 A.2d 515 (1990);

for the use of prior inconsistent *written* statements. We have held, however, that a tape recording of a prior statement may be admitted even though it was not signed because "the recording of the witness' voice imparts the same measure of reliability as a signature." *State v. Woodson,* 227 Conn. 1, 21, 629 A.2d 386 (1993).

*State* v. *Hopkins,* 222 Conn. 117, 124–26, 609 A.2d 236 (1992). Thus, in *State* v. *Alvarez,* supra, 312–13, we upheld the admission of a prior inconsistent statement for substantive purposes despite the fact that the witness claimed no memory loss, but instead testified, contrary to her previous written statement, that she had neither seen who had shot the victim, nor had she seen the defendant with a gun. Similarly, in *State* v. *Hopkins,* supra, 126, we upheld the admission of a statement identifying the defendant where, at trial, the witness claimed that she had seen two men whom she could not identify.

In the present case, the trial court reasonably found sufficient indicia of reliability in the circumstances surrounding the victim's statement to uphold its admission for substantive purposes. First, the victim gave her statement to a police officer on the day of the incident described in the statement. The statement was made "long before the witness' memory [of such an event] might have faded." (Internal quotation marks omitted.) *State* v. *Alvarez,* supra, 314. She also signed the statement after reading it, and swore to its accuracy under oath.[6] She confirmed at trial that the words in the statement were the words that she had spoken to Olofson. Most importantly, the victim's statement was not "given in response to leading questions, which are laden with facts to which the witness has merely answered with a yes or no." (Internal quotation marks omitted.) *State* v. *Hopkins,* supra, 125.

Furthermore, there was ample corroborative evidence in the present case. Id., 123. Olofson testified that after she had taken the statement from the victim, she asked to see the marks that the victim had

---

[6] While it is not necessary for a written, signed statement to be sworn in order for it to be admitted under the *Whelan* doctrine; *State* v. *Almeda,* 211 Conn. 441, 452, 560 A.2d 389 (1989); it certainly is a circumstance that adds to the reliability of the statement.

claimed were on her body. Olofson testified that the victim had had visible marks on her ankles, and had also showed Olofson marks on her wrists and cuts on her top and bottom lips.[7] Olofson accompanied the victim to her house where she viewed pieces of cut up lingerie, a rope, and two knives. Finally, Olofson testified that there were "narrow vertical marks" in the walls of the bedroom. Olofson's observations corroborated the victim's statement, and thereby enhanced its reliability, preventing the specter of a prosecution based solely on an out-of-court inconsistent statement. "It is the trial court's responsibility to weigh the reliability of each statement on a case-by-case basis." Id., 126. In the present case, the trial court properly found that the out-of-court statement given by the victim had sufficient indicia of reliability to be admitted for both impeachment and substantive purposes.

The defendant also argues that the state did not establish a sufficient foundation to admit the prior inconsistent statement. Specifically, the defendant argues that the victim's recantation alone was insufficient, and that the state should have been required to elicit through direct examination her specific version of the events. We disagree. Once the victim denied categorically that abuse had taken place, her prior statement detailing egregious abuse was sufficiently inconsistent to establish a foundation for the *Whelan* hearsay exception.[8]

---

[7] Olofson testified that the marks had the appearance of being "reddened" and appeared to be "indentation[s]." Olofson testified that she was trained as an emergency medical services technician, and she opined that based on her training the marks were consistent with the incidents that the victim had described in her statement.

[8] The defendant at oral argument also claimed that the rule in *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86 (1986), applies only to the prior inconsistent statements of *witnesses* to crimes, and does not apply to the prior inconsistent statement of *victims* of crime. We are unable to ascertain any reason for making such a distinction. In *State* v. *Hopkins*, 222 Conn. 117,

## II

The defendant next claims that the trial court improperly admitted the testimony of an expert witness concerning battered woman's syndrome. The state in its case-in-chief offered into evidence the expert testimony of Evan Stark, a sociologist, on the subject of that syndrome. The evidence was offered for the purpose of providing a possible explanation for the victim's recantation and to impeach her subsequent testimony that she had lied in the statement to get the defendant drug counseling. After a preliminary examination of Stark outside of the presence of the jury and briefing and argument by counsel, the trial court allowed the testimony over the defendant's objection.

The defendant raises three objections to Stark's testimony. First, the defendant claims that battered woman's syndrome has not gained the general acceptance in the scientific community that the defendant asserts is required for its admission. Second, the defendant argues that Stark was not an expert on the subject of battered woman's syndrome. Finally, the defendant claims that the expert testimony should have been excluded because it invaded the province of the jury, inasmuch as the jury has the sole prerogative of assessing and determining the credibility of witnesses. We will treat these claims seriatim.

### A

The defendant first claims that the subject of battered woman's syndrome does not meet the test for admissibility of scientific evidence articulated in *Frye* v.

---

609 A.2d 236 (1992), the witness whose prior inconsistent statement was properly introduced for substantive purposes was a victim of crime, although not the only victim. The witness' prior statement "identified the defendant as the person who had approached the car and had fired the shot that killed [the other victim] *and wounded her.*" (Emphasis added.) Id., 121.

*United States,* 293 F. 1013 (D.C. Cir. 1923).[9] The *Frye* test requires that when scientific expertise is offered, the subject matter of the testimony "must be sufficiently established to have gained general acceptance in the particular field in which it belongs." (Internal quotation marks omitted.) *State* v. *Hasan,* 205 Conn. 485, 489, 534 A.2d 877 (1987).[10] On the basis of existing literature, the defendant argues that battered woman's syndrome has not gained general acceptance in any of various scientific communities.

This court does not apply the *Frye* test to all types of expert testimony, even if technical or scientific concepts are involved. In *State* v. *Hasan,* supra, 489, we noted that we have previously applied the *Frye* test to "innovative scientific techniques . . . [including] polygraph testing . . . and human leukocyte antigen testing for paternity." (Citations omitted.) See *State* v. *McClary,* 207 Conn. 233, 246, 541 A.2d 96 (1988) (finding that shaken baby syndrome is a diagnosis generally accepted in the medical field); *State* v. *Tomanelli,* 153 Conn. 365, 370, 216 A.2d 625 (1966) (applying the *Frye* test to the use of police radar). We have found

[9] In *Knock* v. *Knock,* 224 Conn. 776, 787, 621 A.2d 267 (1993), we permitted the admission of Stark's expert opinion that the defendant was in fact a battered woman, without any mention of the "general acceptance" test. The parties in that case made no claim that the *Frye* test would apply to such testimony, however, and therefore we treat the question as one of first impression.

[10] "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." (Internal quotation marks omitted.) *State* v. *Hasan,* 205 Conn. 485, 489, 534 A.2d 877 (1987). We recognize that the United States Supreme Court in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,*      U.S.     , 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), has cast some doubt on the continued viability of the *Frye* test. We need not, however, address this issue here.

the *Frye* test appropriate when the experimental, mechanical or theoretical nature of the scientific evidence had the "potential to mislead lay jurors awed by an aura of mystic infallibility surrounding scientific techniques, experts and the fancy devices employed." (Internal quotation marks omitted.) *State* v. *Hasan,* supra, 490.

Nevertheless, expert testimony need not satisfy the *Frye* test in cases where "the jury is in a position to weigh the probative value of the testimony without abandoning common sense and sacrificing independent judgment to the expert's assertions based on his special skill or knowledge. . . . Furthermore, where understanding of the method is accessible to the jury, and not dependent on familiarity with highly technical or obscure scientific theories, the expert's qualifications, and the logical bases of his opinions and conclusions can be effectively challenged by cross-examination and rebuttal evidence." (Citation omitted.) Id., 491. For example, without even discussing the *Frye* test, we upheld the admissibility of expert testimony on the behavioral characteristics of child sexual abuse victims. *State* v. *Spigarolo,* 210 Conn. 359, 375–77, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989). In *Spigarolo,* the expert social worker's specialized knowledge was derived from the evaluation or treatment of 100 to 150 cases of child sexual abuse. We upheld the admission of the expert testimony, finding that it met the prerequisite of being "helpful" to the jury. Id., 376.

In the present case, Stark did not examine the victim. He did not offer any opinion as to whether she was a battered woman or whether she exhibited the typical behavioral characteristics of a battered woman. Stark did not apply any scientific instrument or test to specific evidence in the case, nor did he use battered woman's syndrome as a diagnostic tool. Finally, he did

not apply any scientific test to a hypothetical question posed by the state. Instead, Stark's testimony was based on his observations of a large group of battered women through the lens of his educational background and experience.[11] The state offered Stark's testimony in order to provide an interpretation of the facts that a lay jury might not have perceived because of its lack of experience with battered women. See *State* v. *Kelly,* 97 N.J. 178, 204–206, 478 A.2d 364 (1984); see also *People* v. *Hampton,* 746 P.2d 947, 950–51 (Colo. 1987) (*Frye* test inapplicable to expert testimony in rape trauma syndrome case where expert did not testify that victim suffered from the syndrome or had been raped). We conclude that satisfaction of the *Frye* test is not a necessary precondition for the admission of expert testimony on battered woman's syndrome.

## B

The defendant also challenges Stark's qualifications to testify as an expert witness on battered woman's syndrome. "Generally, expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *State* v. *Spigarolo,* supra.

The defendant claims that Stark was not qualified to testify as an expert witness about battered woman's

---

[11] The defendant initially grounds his argument on the fact that when asked by the state's attorney if the subject of battered woman's syndrome is "acceptable" within the scientific community, the expert responded that there is "general agreement within the scientific community" as to the nature of battered woman's syndrome. The defendant argues that the *Frye* test requires general *acceptance* within the scientific community, as distinguished from the slightly different language used by the state's attorney and the expert in response. We need not address this particular contention because we conclude that the *Frye* test is inapplicable to the present case.

syndrome because he did not hold degrees in psychology or psychiatry, was not licensed to do psychological testing, had not published in psychiatric or psychological journals, and had never before testified as an expert before a jury.[12] "The determination of the qualification of an expert is largely a matter for the discretion of the trial court. . . . The trial court's decision is not to be disturbed on appeal unless that discretion has been abused, or the error is clear and involves a misconception of the law. . . . In order to testify as an expert, an expert must demonstrate a special skill or knowledge, beyond the ken of the average juror, that, as properly applied, would be helpful to the determination of an ultimate issue." (Citations omitted; internal quotation marks omitted.) *Knock* v. *Knock*, 224 Conn. 776, 783–84, 621 A.2d 267 (1993).

Stark testified that his qualifications included a master's degree in social work from Fordham University and a doctorate in sociology from the State University of New York. He was a tenured associate professor of public administration at Rutgers University and codirector of a domestic violence training project in New Haven. He also indicated that, at the time of trial, he was a visiting professor of social work at the State University of New York at Stonybrook.

As to his experience in the area of domestic violence, Stark testified that he was codirector of a Yale School of Medicine project funded by the National Institutes of Mental Health that had reviewed the medical histories of approximately 3600 women who had come to

---

[12] In his brief and at oral argument, the defendant also argued that Stark did not examine the victim, and therefore his expert opinion was not based on his own personal observations, rendering him unqualified to testify. Stark's testimony, however, *was* based on his personal knowledge of battered woman's syndrome, which included experience with more than 200 battered women over a period of years. Stark drew on this personal knowledge to testify as to the general characteristics of battered women.

the hospital complaining of injury. He also testified that he was codirector of several other projects that had examined the relationships between domestic violence and child abuse, domestic violence and pregnancy, and the correlation between women who had attempted suicide and domestic violence. He was cochair of the United States Surgeon General's working group on domestic violence and health, and had also published approximately fifty book chapters and professional journal articles.

We have previously upheld a trial court's determination that Stark was qualified as an expert on battered woman's syndrome and that his testimony was relevant in the context of a family matter to determine the issue of custody of a minor child. Id., 784–86. In light of Stark's extensive educational background, work experience, and research in the area of battered woman's syndrome, we conclude that the trial court did not abuse its discretion in determining that Stark was qualified as an expert on battered woman's syndrome.

Not only was Stark qualified to testify, but his testimony focused on a subject that is beyond the knowledge and experience of the average juror. See *People v. Wilson*, 194 Mich. App. 599, 487 N.W.2d 822, 824 (1992). Commentators have noted that "the research data indicates that potential jurors may hold beliefs and attitudes about abused women at variance with the views of experts who have studied or had experience with abused women. In particular, males are likely to be skeptical about the fear the woman feels in an abusive relationship and about her inability to leave a setting in which abuse is threatened." N. Vidmar & R. Schuller, "Juries and Expert Evidence: Social Framework Testimony," 52 Law & Contemp. Probs. 133, 154 (1989); see *State v. Hennum*, 441 N.W.2d 793, 798

(Minn. 1989) (applying similar "beyond the understanding of the average person" test and allowing expert testimony on battered woman's syndrome).

In the present case, Stark presented a general description of battered woman's syndrome, based on his experience with battered women and research and study in the area of domestic violence. Stark defined the term "battered woman's syndrome" as referring "to the behavioral and psychological consequences that many victims, but by no means all victims, experience as a consequence of living in domestic violence situations."

Stark explained that there are certain characteristics that are commonly found in relationships involving domestic violence. First, there is the "cycle of violence," in which "there's a period of tension build up in the relationship and then there's what we call the abusive episode where the batter[er] explodes and there's violence maybe combined with other forms of force and harassment . . . and it's at that point or soon after that point that the battered woman may be quite clear about her danger and quite forthright in seeking help. But the next phase is what we call the honeymoon phase or where the batter[er] either says he'll never do it again or . . . enters some kind of treatment program . . . . And she doesn't want the relationship to end, she wants violence to end. And she believes maybe this time it will be different. So at that point she's likely to believe that, in fact, it won't happen again. And she may at that point then either change her story or try to . . . do what she needs to do . . . in order to survive and to feel safe in the relationship."

Stark testified that some battered women develop a "learned helplessness" from repeated failures to take control of the relationship. The result of such learned

helplessness is that battered women fail to take advantage of subsequent opportunities to seek help and escape the battering situation.

Stark also testified: "Now, the battered woman's syndrome includes a lot of behaviors which don't make any sense when you understand them as an outsider, but only make sense when you understand them from the standpoint of survival and safety." Stark testified that battered women may stay in a relationship with an abuser despite the abuse. Battered women commonly fail to report their problems or delay reporting them to the authorities or others. Such women, who have suffered extraordinary harm, commonly minimize or even deny the harm that they have suffered. Finally, there is the "paradoxical situation . . . where a woman will come in on one occasion and present a very clear and concise picture of danger that she's in, either explaining it to her health provider or to a police officer, and then a week later completely change her story." Stark testified that this last pattern "is one of the most common things that we see in the field."

Stark's testimony was consistent with the theory of battered woman's syndrome as it has been presented and discussed in scholarly commentary. See L. Walker, The Battered Woman Syndrome (1984) pp. 86–94, pp. 95–104; R. Schuller & N. Vidmar, "Battered Women Syndrome Evidence in the Courtroom: A Review of the Literature," 16 Law & Human Behavior 273, 274–77 (1992); C. Ewing, Battered Women Who Kill: Psychological Self-Defense as Legal Justification (1987) pp. 7–21; see generally L. Walker, The Battered Woman (1979).[13]

---

[13] The defendant also argues that expert testimony concerning battered woman's syndrome should not be admitted because the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (3d Ed. 1987), an important diagnostic treatise in the medical, psychiatric,

Moreover, expert testimony concerning battered woman's syndrome has been accepted by many courts when the testimony was offered by a criminal defendant to bolster a claim of self-defense. See, e.g., *People v. Minnis,* 118 Ill. App. 3d 345, 455 N.E.2d 209 (1983); *State v. Hundley,* 236 Kan. 461, 693 P.2d 475 (1985); *Commonwealth v. Craig,* 783 S.W.2d 387 (Ky. 1990); *State v. Anaya,* 438 A.2d 892 (Me. 1981); *State v. Kelly,* supra; *Bechtel v. State,* 840 P.2d 1 (Okla. Crim. App. 1992); *Commonwealth v. Stonehouse,* 521 Pa. 41, 555 A.2d 772 (1989); *Fielder v. State,* 756 S.W.2d 309 (Tex. Crim. App. 1988). Such expert testimony has also been accepted if offered by the prosecution to explain the recantation of the complaining witness; *Arcoren v. United States,* 929 F.2d 1235 (8th Cir.), cert. denied, U.S. , 112 S. Ct. 312, 116 L. Ed. 2d 255 (1991); and if offered to explain the victim's delay in reporting the abuse and remaining with the defendant after the abuse. *State v. Frost,* 242 N.J. Super. 601, 614, 577 A.2d 1282, cert. denied, 127 N.J. 321, 604 A.2d 596 (1990); *State v. Ciskie,* 110 Wash. 2d 263, 272, 751 P.2d 1165 (1988); see generally J. Schroeder, "Using Battered Woman Syndrome Evidence in the Prosecution

and psychological fields, does not contain any reference to the syndrome. Stark specifically disclaimed, however, that the "syndrome" is an illness or mental disorder, but instead testified that battered women are "focusing on survival and safety . . . [which] leads to these paradoxical behaviors and attitudes." See *Bechtel v. State,* 840 P.2d 1, 7 (Okla. Crim. App. 1992) (rejecting a similar argument and stating that the syndrome is a mixture of both psychological and physiological symptoms but is not a mental disease); *Commonwealth v. Craig,* 783 S.W.2d 387, 389 (Ky. 1990) (syndrome was not mental condition and expert could qualify to testify about it although not a psychiatrist or clinical psychologist); R. Schuller & N. Vidmar, "Battered Women Syndrome Evidence in the Courtroom: A Review of the Literature," 16 Law & Human Behavior 273, 281 (1992) (despite the label, battered woman's syndrome is not a diagnosable mental disorder, but is rather a descriptive term that refers to the effects of abuse on a woman).

of a Batterer," 76 Iowa L. Rev. 553 (1991).[14] We conclude that the subject of battered woman's syndrome is " 'beyond the ken of the average juror,' " and therefore meets the threshold test for admissibility of expert testimony in this state. *Knock* v. *Knock,* supra, 784; *People* v. *Wilson,* supra.

Finally, Stark's expert testimony in this case was helpful to the jury. The most important issue in this case was the credibility of the victim. Her written, signed statement alleged that she had been the victim of egregious abuse. Before the jury, the victim testified that she had not been abused and that indeed it was she who had tied up the defendant and abused him. The defendant, through cross-examination of Olofson, questioned the credibility of the victim's written statement in view of her eighteen hour delay in making the complaint. The victim testified that she had made up the statement in order to get her husband into drug treatment. The state offered a different explanation, one beyond the knowledge and understanding of the average juror—that the statement was true, and the victim's recantation was a pattern of typical behavior consistent with battered woman's syndrome.

In a case directly on point, the Eighth Circuit Court of Appeals upheld the admission of expert testimony on battered woman's syndrome to impeach an abuse victim's recantation at the criminal prosecution of the abuser. *Arcoren* v. *United States,* supra, 1241. In *Arcoren,* a victim of rape and assault described the defendant's violent sexual and physical assaults to a criminal investigator with the Bureau of Indian Affairs. Id.,

---

[14] "[P]rosecuting a batterer poses special problems. The battered woman is likely to hide the fact that she is being abused, which results in mate abuse remaining largely unreported. . . . If charges are filed, the battered woman may change her mind about prosecuting the batterer and withdraw her complaint, refuse to testify as a witness, or recant." J. Schroeder, "Using Battered Woman Syndrome Evidence in the Prosecution of a Batterer," 76 Iowa L. Rev. 553, 559–60 (1991).

1237. The victim also testified as to the assaults before a grand jury. At trial, however, the victim recanted her prior testimony and denied that the defendant had beaten and raped her. Id., 1238. The Circuit Court of Appeals noted that, as in the present case, the jury was then "faced with a bizarre situation." Id., 1240. "A jury naturally would be puzzled at the complete about-face she made, and would have great difficulty in determining which version of [the victim's] testimony it should believe. If there were some explanation for [the victim's] changed statements, such explanation would aid the jury in deciding which statements were credible." Id. Like the expert testimony in *Arcoren,* Stark's testimony provided the jury in the present case with an explanation for the victim's changed statements.

On the basis of the foregoing, we conclude that Stark was qualified to testify as an expert witness, that his testimony focused on a subject not familiar to the average person and that his testimony was helpful to the jury. Accordingly, his expert testimony was properly admitted.[15]

C

The defendant's final claim is that the expert testimony in this case was actually opinion testimony as to the credibility of a witness, and therefore should have been excluded because it improperly invaded the province of the jury. The defendant relies on two recently

---

[15] Of course, expert testimony, like all other evidence, must be relevant to be admitted. *State* v. *Wade,* 96 Conn. 238, 248, 113 A. 458 (1921). Expert testimony on the subject of battered woman's syndrome is not relevant unless there is some evidentiary foundation that a party or witness to the case is a battered woman, and that party or witness has behaved in such a manner that the jury would be aided by expert testimony providing an explanation for the behavior. *State* v. *Koss,* 49 Ohio St. 3d 213, 218, 551 N.E.2d 970 (1990). In the present case, the defendant has not challenged the adequacy of the requisite foundation, and therefore we need not reach the issue.

decided cases; *United States* v. *Whitted*, 994 F.2d 444 (8th Cir. 1993); *State* v. *Cheeks*, 253 Kan. 93, 853 P.2d 655 (1993); in which convictions were reversed because physician experts testified that, in their opinions, the child victims were in fact sexually abused by the respective defendants. In *Whitted*, the court concluded that the expert testimony, which was based on the victim's subjective version of events, "significantly enhanced [the victim's] believability and unfairly tilted the scales in her favor." *United States* v. *Whitted*, supra, 447. In *Cheeks*, the expert witness identified a child's crying and defecating as the two forms of behavior most likely to trigger an assault or abuse of a child, and then testified that such behavior was present and was a likely trigger of the abuse in that case. *State* v. *Cheeks*, 103.

Certainly, the jury had the right to consider Stark's testimony in determining whether to believe the victim's prior statement or her testimony at trial. Stark did not testify, however, that the victim was in fact battered and therefore did not comment, directly or indirectly, on her credibility.[16] Rather, this case is similar to *State* v. *Spigarolo*, supra, 377, in which we held that a trial court did not abuse its discretion by admitting an expert witness' testimony on the general behavioral characteristics of child abuse victims. We rejected the defendant's claim that the testimony usurped the jury's function of assessing the credibility of witnesses, noting that there is a "critical distinction between admissible expert testimony on general or typical behavior patterns of . . . victims and inadmissible testimony directly concerning the particular victim's credibility." Id., 379. In the present case, the

---

[16] By noting that Stark did not testify that the victim was a battered spouse, we do not imply that such testimony would have implicitly commented on her credibility. Rather, in the context of this case, we need not decide whether an expert witness may offer his or her opinion as to whether a spouse is a battered spouse, nor decide whether such an opinion would implicitly comment on the credibility of the spouse.

purpose of Stark's testimony was to present to the jury possible explanations for why a victim of abuse would completely recant her accusations, explanations that in all likelihood were beyond the jury's experience and knowledge. Stark neither presented opinion testimony as to the credibility of any witness nor indicated whether the out-of-court statement was credible. Like the expert testimony in *Spigarolo*, Stark's testimony was relevant to describe the behavior patterns typically ascribed to battered women's syndrome. The trial court also cautioned the jury that expert testimony "is [not] binding upon you and you may disregard such testimony either entirely or in part. It is for you the triers of the facts to consider the testimony and with the other circumstances in this case, use your best judgment to determine whether or not you give any weight to the testimony and, if so, what weight you will give to it."

Under the circumstances of this case, Stark's expert testimony was properly admitted "to assist the jury in understanding, not whether [the victim] was a credible witness on the witness stand, but whether her conduct . . . was consistent with the pattern and profile of a battered woman." *State* v. *Frost,* supra, 614. We conclude that the expert testimony did not invade the province of the jury in determining the credibility of witnesses.

The judgment is affirmed.

In this opinion the other justices concurred.