******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

DANNEHY, J., with whom MULLINS, C. J., and ALEX-ANDER, J., join, concurring in part and concurring in the judgment. The defendant, Sirus Dixon, claims, and the majority concludes, that the trial court erred in admitting Sergeant Bryan Cooper's expert testimony on "Stamford neighborhoods, neighborhood divisions, and the dynamics between them" because the evidence was not relevant and was unduly prejudicial. Although I agree with the majority that evidence relating to "neighborhood beefs" is akin to local gang disputes and should be considered as such for admissibility purposes, I write separately because I disagree that the trial court erred in admitting all of Cooper's testimony. The record reflects that there was a sufficient factual basis on which the court could have reasonably concluded that the portion of Cooper's testimony relating to Stamford neighborhoods and neighborhood beefs was a proper subject for expert testimony. See Conn. Code Evid. §§ 4-1 and 7-2. The trial court did, however, abuse its discretion by failing to limit the scope of Cooper's testimony, particularly relating to his relationships in the community and information about large-scale drug and firearms trafficking, because such testimony, although arguably relevant to his qualification to testify as an expert, was far more prejudicial than probative.[1] See Conn. Code Evid. § 4-3. For that reason, I respectfully concur in the portion of part I B of the majority opinion addressing the admission of Cooper's testimony. However, because I agree with the majority that any error was harmless,

---

[1] I do not find persuasive either of the all-or-nothing arguments advanced by the parties regarding Cooper's testimony. Rather, as this court has done in cases too numerous to mention, I have considered the record and arguments in the briefs in deciding the very claim raised by the defendant—whether the trial court abused its discretion in admitting Cooper's testimony because it "was not relevant, was unduly prejudicial, and constituted improper propensity evidence"—and resolved the claim on narrower grounds. Part I B of the majority opinion; see, e.g., *Meribear Productions, Inc.* v. *Frank*, 340 Conn. 711, 732–33, 265 A.3d 870 (2021).

I join in the majority's harmlessness conclusion in that same part, as well as in all other respects.

It is well established that "[e]xpert testimony should be admitted when: (1) the witness has special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *State* v. *Fisher*, 342 Conn. 239, 269, 269 A.3d 104 (2022). For an expert opinion to be helpful, the "opinion must have some basis in relevant facts . . . to ensure that the opinion is not entirely speculative or irrelevant to the issues in the case." *Weaver* v. *McKnight*, 313 Conn. 393, 416 n.3, 97 A.3d 920 (2014); see Conn. Code Evid. §§ 4-1 and 7-4 (a); see also *State* v. *Jones*, 351 Conn. 324, 332, 330 A.3d 118 (2025) (noting that "[t]he relevance requirement . . . is a fairly low hurdle" (internal quotation marks omitted)); *State* v. *Borrelli*, 227 Conn. 153, 172 n.15, 629 A.2d 1105 (1993) ("expert testimony, like all other evidence, must be relevant to be admitted").

The testimony of several witnesses at trial, including Tyrik Gill, former Stamford Police Sergeant Christian DiCarlo, and the sister of the victim, Antonio Robinson, established a sufficient factual foundation to render Cooper's expert testimony, with respect to neighborhood associations and ongoing disputes or beefs, helpful to the jury in considering a material issue in the case, namely, motive. Specifically, the prosecutor elicited testimony from those witnesses relating to the different neighborhoods in Stamford and a "beef" between two of the neighborhoods, one of which the defendant purportedly "repped."

On direct examination, Gill explained that he grew up in "the Village,"[2] but that, by 2018, he had moved

---

[2] "The Village" was once known as "Southfield Village," and is now referred to as "Southwood Square." Throughout the testimony and dialogue with the court, this location was also referred to as the "West Side Village."

closer to the victim's home located on Connecticut Avenue. About one month before the shooting, Gill had an altercation with the defendant. Gill testified that, on that day, he was followed home by three individuals, one of whom was the defendant. Once Gill arrived at his house, one of the individuals grabbed Gill's jacket, punched him in the face, and pulled him to the ground. The defendant then kicked and punched Gill, and they stole his sneakers. Gill did not immediately inform the police of this altercation when he met with them after the shooting. A few months after the shooting, however, Gill shared this information with the police and provided a written statement. When asked why he initially did not tell the police everything he knew, Gill explained he did not do so because he was "scared" and "afraid" of "[r]etaliation."

Included within Gill's written statement were other notable details about this altercation. In his statement, Gill explained that, as he was being followed, one of the individuals asked if Gill had "beef with them," to which Gill responded, "I don't care about ya beef." After recounting this exchange, Gill explained in his statement that, "[i]n the past there has been beef between the [W]est [S]ide and Conn[ecticut] Avenue. I lived in the [V]illage, but I have a lot of friends on the [W]est [S]ide, and they probably thought I had beef with them." The statement was not admitted for substantive purposes at trial,[3] but DiCarlo recounted similar information in his testimony, which was admitted for substantive purposes.

---

[3] With respect to Gill's statement, the court instructed the jury: "Also in evidence is state's exhibit 5, which is the signed written statement of . . . Gill given in an interview with . . . DiCarlo of the Stamford Police Department on September 8, 2018. That statement was offered by the state as a prior consistent statement of . . . Gill for the limited purpose of repairing his credibility and to rebut the suggestion of a recent contrivance. Note that such prior out-of-court statements of . . . Gill, whether they are consistent or inconsistent, may not be considered as substantive evidence. They may be considered by you only as they relate to his credibility."

On direct examination, DiCarlo testified that he was able to determine a motive through his investigation of the murder. He explained that "Gill stated that there was an ongoing beef between the Connecticut Avenue and the West Side. [Gill] was originally living on the West Side in the Village and had recently moved over to Conn[ecticut] Avenue. . . . [T]here was a beef between him and [the defendant] where [Gill] was beat up and robbed of his sneakers."

The victim's sister also testified at trial. During her testimony, she explained that, on the night of the shooting, shortly after the victim had left their mother's home on Connecticut Avenue, she left the home as well. On the way back to her own home, the victim's sister drove through a ShopRite parking lot where she stopped and allowed the defendant and two other boys, who were running through the parking lot, to pass by. She explained that she could identify the defendant because he was related to two of her other siblings. She did not know where the defendant was living at the time of the shooting but testified that he was associated with "Connecticut Avenue where, you know, where he's from, I guess." And when asked if she referred to the three boys as the "Conn. Ave. boys" when speaking to the police, she responded, "[p]robably, yes." She later explained that "Conn. Ave. boys" did not include everyone "that live[d] over there" but "[a]ny boy who reps it . . . ." She then explained that she knew "the ones who repped them . . . ."

DiCarlo's testimony, together with the testimony of the victim's sister, established a nexus between the neighborhood associations and the defendant's potential motive for the shooting. Specifically, there was evidence that the defendant "repped" and was affiliated with the Connecticut Avenue neighborhood, which had an ongoing beef with, and animus toward, the West Side neighborhood, with which Gill was purportedly

associated. In my view, this evidence established a sufficient factual basis for Cooper's expert testimony regarding Stamford neighborhood associations and the beefs between them.[4]

At trial, Cooper testified about his tenure with the Stamford Police Department and his specialized training with the Narcotics Enforcement Officer Association, which included some gang training, and with the Police Officer Standards and Training Council (POSTC). He also noted that he was the certified gang instructor for the Stamford Police Department.[5] When asked whether he had any training specific to Stamford neighborhoods, he responded that "a lot of [his] training is based on [his] intimate knowledge in narcotics [and his] relationships with confidential informants, cooperating witnesses, and certain citizens," that, at POSTC, he had to "build a curriculum based on . . . national gangs," and that he teaches officers about "Stamford neighborhood[s]" and their "current and past beef[s] and alignments." When asked a broad question about what information he gathered from members of the community with whom he had fostered relationships, Cooper

[4] In addition to there being a sufficient factual basis for some of Cooper's testimony, Stamford neighborhood associations were a proper subject for expert testimony because Cooper's knowledge was directly applicable to a matter in issue, namely, motive, and such knowledge about the neighborhoods is not common to the average person. See Conn. Code Evid. § 7-2. Further, it should be noted that the defendant does not contest Cooper's qualification as an expert on appeal.

[5] Before Cooper testified at trial, he testified outside the presence of the jury in order for the trial court to determine the admissibility of his expert testimony. At the conclusion of the preliminary testimony and after considering defense counsel's objection that Cooper's testimony was more prejudicial than probative, the court ruled that "evidence of gang affiliation is admissible and relevant and probative on the issue of motive." When the prosecutor inquired about using the term "gang" in connection with Cooper's training, the trial court explained that it was trying to avoid the use of the term "gang" to minimize the prejudicial effect and said that Cooper could talk "about neighborhood beefs; that's all within the scope of what the court's allowing."

responded, "[l]arge-scale drug trafficking within the city. Large-scale firearm[s] trafficking." He went on to describe coordination with the patrol unit that led to "convictions [for] homicides, shootings, serious assaults and robberies."

Immediately following this questioning, the prosecutor asked a narrow question that focused on whether Cooper had gathered information related to specific neighborhoods in Stamford. Cooper testified that he had learned "what neighborhoods align with other neighborhoods, what neighborhoods get along with other neighborhoods, and what neighborhoods don't get along with each other." Cooper then explained the different neighborhood associations, including the West Side and Connecticut Avenue, and that to "rep" a neighborhood meant that the person was "aligned with that neighborhood, whether it's crime activity or noncriminal activity." The prosecutor then offered Cooper as an expert, and he opined, based on his training and experience, about ongoing disputes between particular neighborhoods in Stamford in April, 2018. Cooper testified that there were a few ongoing disputes between particular neighborhood divisions, including an ongoing beef between the Connecticut Avenue division, which refers to itself as "GB Money Dollar Sign A," and the West Side division, which refers to itself as the "D-1 Boys . . . ." Cooper testified that there would be a "[b]ig problem" if someone who "associates with the West Side either directly or through a friend went to Connecticut Avenue" because, "with the ongoing beef . . . you wouldn't see someone from the Spruce Street area," which he had explained was on the West Side, "hanging out in Connecticut Avenue and vice versa."

In the present case, although I conclude that some of the neighborhood evidence was properly admitted into evidence to help the jury understand a motive for the killing, I also conclude that certain evidence was

not. The trial court properly admitted Cooper's testimony relating to the geographic divisions of the neighborhoods in Stamford, their past relationships, and the consequences that may occur if an individual, who either directly or indirectly aligned with one neighborhood, visited a different neighborhood, because such evidence was highly probative of the issue of motive.[6] See, e.g., *State* v. *Bermudez*, 341 Conn. 233, 252, 267 A.3d 44 (2021) ("gang affiliation evidence may be relevant to . . . explain an otherwise inexplicable act" (internal quotation marks omitted)), quoting *State* v. *Dean*, 310 Kan. 848, 862, 450 P.3d 819 (2019); *Atchison* v. *United States*, 257 A.3d 524, 532 (D.C. 2021) (concluding that generalized neighborhood feud evidence was relevant and probative because it supplied motive for otherwise unexplained assault).

Given that Gill had recently moved from another area in Stamford, and given the defendant's connection to the "Conn. Ave. boys" and the altercation between Gill and the defendant one month prior to the shooting, expert testimony related to neighborhood relationships was relevant and helpful to the jury in understanding whether the defendant may have been motivated to

---

[6] In concluding that all of Cooper's testimony was more prejudicial than probative, the majority emphasizes the prosecutor's concession that the state had "no evidence to show [that the defendant had] any gang involvement." Although the prosecutor made this concession, she did so in an attempt to distinguish "gang" evidence from "neighborhood" evidence, which the majority and I now conclude is a distinction without a difference. This, however, does not change the fact that evidence of gang affiliation, or a neighborhood "beef," is probative of the issue of motive. Indeed, after making this representation to the trial court, the court asked the prosecutor how the neighborhood evidence was relevant, to which she aptly responded, "[i]t goes [toward] motive, Your Honor. Having someone come in and serve as an expert to identify the different neighborhoods in Stamford, to identify the dynamics between them would lend [toward] motive. In this case, we anticipate testimony to indicate that [the defendant] was a part of one neighborhood and that [Gill] was a part of another, and that is sort of the crux of the beef between the two."

shoot toward Gill, mistakenly killing the victim, due to Gill's potential connections to the West Side. Indeed, Cooper's testimony that there would be a "[b]ig problem" if someone who "associates with the West Side either directly or through a friend went to Connecticut Avenue," certainly speaks to whether the defendant, someone who is aligned with Connecticut Avenue, would have a motive to shoot someone associated with the West Side. See, e.g., *State* v. *Wilson*, 308 Conn. 412, 430, 64 A.3d 91 (2013) (explaining that gang affiliation evidence may be highly probative of motive). In addition, the trial court properly instructed the jury that this evidence could be considered only for the limited purpose of motive.[7]

Other portions of Cooper's testimony, however, although arguably relevant to his qualification to testify as an expert, were far more prejudicial than probative and should have been excluded by the trial court. We have consistently recognized that, when gang affiliation evidence, or its equivalent, is offered, the trial court must carefully evaluate the evidence, which includes information related to how a police officer may have acquired expertise in a certain area, to determine whether it is more prejudicial than probative because such evi-

---

[7] The trial court instructed the jury: "You heard testimony from . . . Gill of a prior physical altercation between [him] and the defendant in April of 2018, approximately one month before this alleged shooting. You also heard testimony that, during the same time frame, neighborhood divisions existed between different geographic areas within the city of Stamford and the residents living there, such as . . . Gill and [the defendant]. I instruct you that you may use that evidence, to the extent that you find it should be given weight, only as to the existence of a possible motive for the shooting. Any other use of that testimony would be improper. In other words, this evidence cannot be considered as establishing the identification of the defendant as the shooter, or a bad character or predisposition on his part to commit the crime charged, or to demonstrate a criminal propensity. It may be considered only to the extent that you find it may bear on the issue of a possible motive to commit the crime charged. However, you are not obligated to do so."

dence may, in certain circumstances, unduly arouse the emotions of the jurors. See, e.g., *State* v. *Jones*, supra, 351 Conn. 333 (explaining that courts must carefully evaluate probative value of gang affiliation evidence "to ensure that it is sufficiently significant to overcome the potential for unfair prejudice"); *State* v. *Bermudez*, supra, 341 Conn. 250 (explaining that courts must exercise caution because gang affiliation evidence often invokes images of criminal activity and deviant behavior, thereby creating risk that jurors will engage in propensity reasoning); *State* v. *Tomlinson*, 340 Conn. 533, 572, 264 A.3d 950 (2021) ("[a]s with any evidence that might suggest a propensity for violence or might play on potential juror biases, defendants should request and trial courts should grant measures to minimize any undue prejudice").

Although the present case involves disputes between neighborhood associations, I do not see a meaningful distinction between this evidence and gang affiliation evidence. Accordingly, the trial court must exercise the same level of caution when considering the admissibility of such evidence. Here, Cooper's testimony in response to very broad questions about his training and relationships with the community introduced evidence of narcotics, large-scale drug trafficking, and large-scale firearms trafficking. This evidence, which immediately preceded the more probative "neighborhood" testimony, was unduly prejudicial because it needlessly evoked images of a certain type of criminal gang activity that was not present in this case. When the state is offering gang evidence, a court may need to require the prosecutor to ask more focused, narrowly tailored questions because of the risk of unfair prejudice posed by such evidence. Although the trial court, in the present case, specifically limited Cooper's testimony to neighborhood beefs, it did not then carefully balance and exclude the highly prejudicial, yet at best minimally

probative, testimony relating to Cooper's knowledge of narcotics and large-scale drug and firearms trafficking in Stamford. Accordingly, in this respect, I conclude that the trial court abused its discretion by failing to limit the scope of Cooper's testimony.[8]

Although I conclude that the admission of Cooper's testimony relating to his knowledge of narcotics and large-scale drug and firearms trafficking in Stamford was more prejudicial than probative, I nevertheless conclude that the error was harmless. See *State* v. *Toro*, 172 Conn. App. 810, 818–20, 162 A.3d 63 (explaining that, although prejudice and harm may overlap, they are distinct issues and harm inquiry is broader in scope), cert. denied, 327 Conn. 905, 170 A.3d 2 (2017). I therefore join in the harmlessness conclusion in part I B of the majority opinion. Cooper's testimony was relatively brief. In total, the discussion of narcotics and large-scale drug and firearms trafficking comprised less than a single transcript page, and, importantly, the prosecutor did not refer to this testimony during her summation. Furthermore, Cooper's improper testimony was admitted for a limited purpose in two respects. First, the testimony came in only while Cooper was explaining his credentials for the purpose of being qualified as an expert. Cooper did not discuss narcotics and large-scale drug and firearms trafficking with respect to specific neighborhoods in Stamford, including the neighborhood that the defendant purportedly "repped." Second, the court instructed the jury on the limited use of Coo-

---

[8] The defendant also contends that the admission of the testimony constituted improper propensity evidence. I disagree. Although the trial court abused its discretion in failing to limit the scope of the evidence related to neighborhood associations, it properly admitted certain neighborhood association evidence as relevant to motive and not for purposes of "demonstrat[ing] [the] defendant's criminal propensity or bad character." *State* v. *Jones*, supra, 351 Conn. 333. In addition, the trial court instructed the jury that the challenged evidence should not be used to show propensity. See footnote 7 of this opinion.

per's expert testimony.[9] Finally, I agree with the majority that the state's case was strong, and even stronger when considering the evidence of motive that I, unlike the majority, conclude was properly admitted.

Accordingly, I respectfully concur in the portion of part I B of the majority opinion addressing the admission of Cooper's testimony but join in the majority's harmlessness determination in that same part, as well as in all other respects.

––––––––––––––––––––––

[9] Specifically, the court explained, in part, that the expert testimony presented is not "binding upon [the jurors], and . . . [the jurors] may disregard this testimony either in whole or in part. It is for [the jurors] to consider this testimony with the other circumstances in the case and, using [their] best judgment, [to] determine whether [they] will give any weight to it and, if so, what weight [they] will give to it."