## STATE OF CONNECTICUT v. WENDELL HASAN
(13074)

PETERS, C. J., SHEA, GLASS, COVELLO and HULL, Js.

Argued October 2—decision released December 15, 1987

*Michael O. Sheehan,* special public defender, for the appellant (defendant).

---

*Carolyn K. Longstreth,* deputy assistant state's attorney, with whom, on the brief, was *Bruce Hudock,* assistant state's attorney, for the appellee (state).

HULL, J. The sole issue in this appeal is whether the trial court erred in admitting the testimony of a podiatrist identifying as the defendant's a pair of sneakers linked to the scene of the crimes with which he was charged.

After a jury trial, the defendant, Wendell Hasan, was found guilty of felony murder; General Statutes § 53a-54c;[1] and burglary in the first degree. General Statutes § 53a-101 (a) (2).[2] This appeal followed.

The jury could reasonably have found the following facts. On July 2, 1985, the police were called to the home of George and Rachel Tyler to investigate a possible homicide. The police found George Tyler dead in the kitchen, Rachel Tyler injured, and the premises apparently ransacked. The Tylers' son and daughter-in-law determined that George Tyler's wallet was missing as was some of Rachel Tyler's jewelry. Among the evidence secured by the police were broken glass and linoleum bearing a bloody footprint made by a sneaker. Police suspicion turned to the defendant when,

[1] General Statutes § 53a-54c provides in relevant part: "FELONY MURDER. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, sexual assault in the first degree with a firearm, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

[2] General Statutes § 53a-101 (a) (2) provides in relevant part: "BURGLARY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and . . . (2) in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone."

on July 5, 1985, a plumber repairing a clogged toilet in a South Norwalk apartment found two credit cards belonging to George Tyler to be the cause of the clog. The plumber turned the cards over to the owner of the apartment, who reported the find to the police. The police obtained a warrant to search the apartment.

The defendant had been living at the South Norwalk apartment intermittently; it was also occupied by his mother, stepfather, his brother, James Singleton, two sisters and James' girlfriend. Pursuant to the warrant, the police seized several pairs of shoes, including a pair of size ten Puma low cut sneakers which they found at the foot of the bed in which James and his girlfriend slept. The bedroom was actually the defendant's and most of the belongings there were his. James told the police that the sneakers were the defendant's and that his own shoe size was thirteen. During custodial interrogation, the defendant stated that the apartment was his primary residence and that he owned a pair of Puma sneakers liked the ones seized.

The conviction depended in large measure on circumstantial evidence. Glass shards and linoleum fibers found in the sole of one of the sneakers, were similar to the mass produced glass and linoleum located at the crime scene, but could not be positively identified as having come from there. Similarly, human blood detected on the sneakers was consistent with the victims' blood, but could not be positively identified as theirs. During trial, a forensic expert from the Connecticut state police forensic laboratory identified the Puma sneakers as those that made the footprints on the Tylers' kitchen floor. James testified that the defendant had been in and out of the apartment between July 1 and July 3, 1985, and that he had concluded that the sneakers belonged to the defendant because they were in his room under his bed. A former cellmate of the defendant testified that the defendant had admitted to having taken part in the crimes.

In addition to the foregoing, the jury heard the testimony of Dr. Robert Rinaldi, a podiatrist called by the state as an expert witness, who concluded "within reasonable podiatric certainty" that based on his examination of the sneakers and the defendant's feet, the sneakers belonged to the defendant. The defendant excepted to the admission of this testimony[3] and appeals on this ground.

The admissibility of expert testimony depends on whether the witness offered as an expert possesses " ' "any peculiar knowledge or experience, not common to the world, which renders [his] opinions founded on such knowledge or experience any aid to the court or the jury in determining the questions at issue." ' " *State* v. *Girolamo,* 197 Conn. 201, 214, 496 A.2d 948 (1985); *State* v. *Esposito,* 192 Conn. 166, 175, 471 A.2d 949 (1984); C. Tait & J. LaPlante, Connecticut Evidence (1976) § 7.16, p. 96. The knowledge may be drawn from reading alone, from experience alone, or from both. *State* v. *Esposito,* supra. Whether a witness is qualified to testify as an expert is a matter that lies within the discretion of the trial court. *State* v. *Palmer,* 196 Conn. 157, 167, 491 A.2d 1075 (1985). Expert testimony is admissible if the witness possesses a special skill or knowledge directly applicable to a matter in issue, the skill or knowledge is not commonly shared by the average person, and the testimony would be helpful to the court or jury in considering the issues; *State* v. *Kemp,* 199 Conn. 473, 476, 507 A.2d 1387 (1986); or in teaching the jury to view items of physical evidence by focusing their attention on certain salient features. *State* v. *Palmer,* supra, 166. Absent an abuse of discretion, we will not disturb a trial court's decision in admitting or excluding such testimony. Id.

[3] Prior to trial, the defendant filed a motion in limine addressed to Rinaldi's testimony. Consideration of the motion was postponed until trial. The court denied the motion and granted the defendant a standing exception to the testimony.

Many jurisdictions have adopted a special rule for admissibility of scientific evidence, in accordance with *Frye* v. *United States,* 293 F. 1013 (D.C. App. 1923). C. Tait & J. LaPlante, Connecticut Evidence (1983 Sup.) § 7.16, p. 55; C. McCormick, Evidence (3d Ed. 1984) § 203, p. 606. There the court stated: "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye* v. *United States,* supra, 1014.

The Frye "general acceptance" test has been employed to assess the admissibility of spectrographic voice analysis; *People* v. *Kelly,* 17 Cal. 3d 24, 549 P.2d 1240, 130 Cal. Rptr. 144 (1976); *Commonwealth* v. *Lykus,* 367 Mass. 191, 327 N.E. 2d 671 (1975); ion microprobic analysis of hair samples; *United States* v. *Brown,* 557 F.2d 541 (6th Cir. 1977); and hypnotically refreshed recollection. *People* v. *Shirley,* 31 Cal. 3d 18, 641 P.2d 775, 181 Cal. Rptr. 243, cert. denied, 459 U.S. 860, 103 S. Ct. 133, 74 L. Ed. 2d 114 (1982). We have acknowledged that *Frye* sets forth the prevailing standard for evaluating the admissibility of evidence derived from innovative scientific techniques. *Moore* v. *McNamara,* 201 Conn. 16, 30, 513 A.2d 660 (1986). We have expressly applied it to polygraph testing; *State* v. *Miller,* 202 Conn. 463, 484, 522 A.2d 249 (1987); and to human leukocyte antigen testing for paternity. *Moore* v. *McNamara,* supra. We have applied the "general acceptance" standard, without reference to *Frye,* in *State* v. *Mitchell,* 169 Conn. 161, 169–70, 362 A.2d 808 (1975) (polygraph testing), *Molino* v. *Board of Pub-*

*lic Safety,* 154 Conn. 368, 376–77, 225 A.2d 805 (1966) (polygraph testing), and *State* v. *Tomanelli,* 153 Conn. 365, 370, 216 A.2d 625 (1966) (police radar).

The defendant argues that the evidence elicited from Rinaldi was scientific evidence subject to the standard for admissibility articulated in *Frye.* We disagree.

"The *Frye* test finds its rational basis in the degree to which the trier of fact must accept, on faith, scientific hypotheses capable of proof or disproof in court and not even generally accepted outside the courtroom." *People* v. *Marx,* 54 Cal. App. 3d 100, 110, 126 Cal. Rptr. 350 (1975). *Frye* contemplates those situations in which the evidence sought to be admitted is beyond the understanding of the ordinary juror who must sacrifice his independent judgment in deference to the expert. *People* v. *Marx,* supra, 110–11. Among the dangers created by such scientific evidence is its potential to mislead lay jurors "awed by an 'aura of mystic infallibility' surrounding 'scientific techniques,' 'experts' and the 'fancy devices' employed." *United States* v. *Williams,* 583 F.2d 1194, 1199 (2d Cir. 1978), cert. denied, 439 U.S. 1117, 99 S. Ct. 1025, 59 L. Ed. 2d 77 (1979). The fact that a technique or method has gained general acceptance in the scientific community to which it belongs tends to ensure that the jury will not accord undue weight to theories whose validity has not been adequately tested. *People* v. *Kelly,* supra, 31–32.

Such infirmities do not inhere in all types of expert evidence. Accordingly, the *Frye* test has been either ignored or rejected in cases in which the method used by the expert was a matter of physical comparison rather than scientific test or experiment; *Ex parte Dolvin,* 391 So. 2d 677 (Ala. 1980) (identification of skeletal remains by comparing teeth and facial structure with photographs of victim; *Frye* inapplicable); the

basic data upon which the expert relied was verifiable by the factfinder; *People* v. *Marx,* supra (bite mark identification; trier shown models, photographs, X-rays and slides of victim's wounds and defendant's teeth; *Frye* inapplicable); or where established techniques were applied to the solution of novel problems. *State* v. *Temple,* 302 N.C. 1, 273 S.E.2d 273 (1981) (bite mark identification by application of dentistry and photography; *Frye* ignored). Many of these cases have involved identification of bite marks by comparison of the defendant's dental impressions to bite marks found on a victim's body; see, e.g., *State* v. *Asherman,* 193 Conn. 695, 478 A.2d 223 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985); *People* v. *Marx,* supra; *Niehaus* v. *State,* 265 Ind. 655, 359 N.E.2d 513, cert. denied, 434 U.S. 902, 98 S. Ct. 297, 54 L. Ed. 2d 188 (1977); *Commonwealth* v. *Cifizzari,* 397 Mass. 560, 492 N.E.2d 357 (1986); and identification of footprints by comparing shoes found at the crime scene with shoes worn by the defendant; *United States* v. *Ferri,* 778 F.2d 985 (3d Cir. 1985), cert. denied, 476 U.S. 1172, 106 S. Ct. 2896, 90 L. Ed. 2d 983 (1986); or by comparing footprints found at the crime scene with the defendant's feet. *State* v. *Mark,* 286 N.W.2d 396 (Iowa 1980); *State* v. *Bullard,* 312 N.C. 129, 322 S.E.2d 370 (1984). In such cases, the jury is in a position to weigh the probative value of the testimony without abandoning common sense and sacrificing independent judgment to the expert's assertions based on his special skill or knowledge. *People* v. *Marx,* supra. Furthermore, where understanding of the method is accessible to the jury, and not dependent on familiarity with highly technical or obscure scientific theories, the expert's qualifications, and the logical bases of his opinions and conclusions can be effectively challenged by cross-examination and rebuttal evidence. See *State* v. *Ortiz,*

198 Conn. 220, 228, 502 A.2d 400 (1985). Rinaldi's testimony falls within this category.[4]

At trial, Rinaldi was duly qualified as a podiatrist and foot surgeon whose practice includes sports medicine and treatment of athletes.[5] He testified that, in the course of his work, he examines the footwear of his patients to determine whether it is appropriate for their feet. Following this testimony, the defendant objected on the ground that the state had failed to qualify Rinaldi as an expert in the field of matching shoes to feet. Out of the jury's presence, Rinaldi testified that it is common podiatric practice in the treatment of foot ailments to assess the suitability of a patient's shoes for his feet, and that, although he could not positively match a shoe to a foot, he could ascertain from a particular shoe some of the characteristics of its wearer's foot, gait and stature. He stated further that he could detect foot deformities by the rubbing and wear patterns on both the inside and outside of the shoe and that, over time, a shoe conforms to the shape of its wearer's foot, and asserted that every foot has its own "signature." He conceded that he had never conducted any tests identifying shoes with feet, had never conducted any research in this area, and was not aware of any published reports or scientific data on the subject. The court found Rinaldi qualified to testify to the correlation between the sneakers and the defendant's feet.

When the jury returned, Rinaldi testified that, with wear, shoes conform to the contours of the foot and

---

[4] We have articulated only two approaches to admissibility of expert evidence. There are others. See, e.g., *People* v. *Slone,* 76 Cal. App. 3d 611, 143 Cal. Rptr. 61 (1978) (human bite mark evidence admissible under *Frye;* reliability of the method established by expert testimony that technique had gained general acceptance in the scientific community of dentistry); *People* v. *Colombo,* 118 Ill. App. 3d 882, 455 N.E. 2d 733 (1983), cert. denied, 467 U.S. 1208, 104 S. Ct. 2394, 81 L. Ed. 2d 351 (1984) (handprint identification testimony admissible under "liberal" *Frye* reliability test).

[5] The defendant does not contest Rinaldi's qualifications as a podiatrist. He challenges his expertise in the art of matching shoes to feet.

that the foot's characteristics are manifested in the outline of the shoe. He explained that, in order to determine the proper fit of a shoe, he observes the foot, feels the foot inside the shoe and measures the foot with a Brannick device.[6] He then detailed his method for matching the Puma sneakers to the defendant's feet, illustrating his testimony with the sneakers. He explained that before he saw the defendant, he examined the shoes, concluding that the wearer was flat-footed, was on the heavy side and had prominences on two of his toes. His subsequent examination of the defendant's feet confirmed his hypothesis. He measured the defendant's feet with a Brannick device and felt the feet, both with and without socks, in the sneakers and out, walking, standing and sitting. He noted that when the defendant put the shoes on, he slipped his feet into them, unlacing them only "a very, very little bit," confirming the podiatrist's personal observation that when a shoe has been molded to a foot, the foot slides easily in and out of it. He observed that the defendant was flatfooted and that the shape of his heel was consistent with that condition. Furthermore, he felt the protruberances on the defendant's toes and the molding of the shoe around them. On the basis of these observations, Rinaldi concluded, with reasonable podiatric certainty, that the sneakers had been worn by and belonged to the defendant.

On cross-examination, Rinaldi conceded that there is no science, within the profession of podiatry, of matching sneakers to people, that he had never before testified in court on the subject, that he had never performed any blind studies or conducted research in the area, and that if given several pairs of sneakers, he could not definitely match them with their owners. Fur-

---

[6] Rinaldi explained that a Brannick device measures the length and width of the foot and is considered by the shoe industry to provide the most accurate measurement of the foot.

thermore, he testified that the features of the defendant's feet from which he drew his conclusions are very common.

The fact that there is no science of matching shoes to people or that Rinaldi was not qualified as an expert practitioner in that narrow field forms no barrier to the admissibility of his testimony. We consider this case one in which the established techniques in Rinaldi's uncontested area of expertise have been applied to the solution of a novel problem that is well within the capability of those techniques. See *People* v. *Marx,* supra; *State* v. *Temple,* supra.

We conclude that the admissibility of Rinaldi's testimony did not depend on general acceptance of his theories in the scientific community. His conclusions relied on no advanced technology, nor did he employ scientifically sophisticated methods, the understanding of which lies beyond the the intellectual powers of the ordinary layperson. The jury was not required to accept blindly the merit of his conclusions or methods. It had before it the same sneakers which had been examined by the podiatrist and, during the course of the trial, had seen the defendant try them on and walk in them.[7] The value of Rinaldi's expertise lay in its assistance to the jury in viewing and evaluating the evidence. Cross-examination exposed the jury to the lack of literature pertaining to matching shoes to feet, and to the absence of studies or research in this area by Rinaldi or others. His credentials and methodology were before the jurors, who were competent to assess the reliability of the evidence and who could freely accept or reject his conclusions. See *United States* v. *Williams,* supra, 1199–1200. We hold, therefore, that the trial court did

[7] Following direct examination of Rinaldi, the defendant was asked to don the sneakers and walk before the jury in them. He did so.

not abuse its discretion in admitting Rinaldi's testimony.

There is no error.

In this opinion the other justices concurred.