[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION IN LIMINE TO EXCLUDE TESTIMONY OF DAVID YAFFE
In this case, plaintiff Pepe Hazard ("PH"), a law firm with its principal place of business in Hartford, Connecticut, has brought suit against three of its former partners, defendants Richard D. Jones, Timothy J. Boyce and Marc B. Friedman ("the individual defendants"), and their current law firm, defendant Dechert, Price Rhoads of Philadelphia, Pennsylvania ("Dechert"), to recover money damages in connection with the individual defendants' early 1996 departure from PH to establish a new Hartford office for Dechert. PH's claims against the defendants are as follows: breach of fiduciary duty (Count I) and breach of contract (Count II) against all of the individual defendants; fraud (Count III) and computer conversion (Count VI) against defendants Jones and Friedman; misappropriation of trade secrets (Counts VII and VIII) against defendants Jones and Dechert; and conspiracy to breach fiduciary duties and contractual obligations (Count IV), tortious interference with contractual rights (Count V), and tortious interference with business expectations (Count IX) against defendant Dechert. As relief for the defendants' alleged misconduct, PH seeks, inter alia, to recover compensatory damages for profits it claims to have lost as a result of such misconduct in the operation of its Real Estate/Finance Practice Group ("Practice Group"), of which defendant Jones was the chairman and defendants Boyce and Friedman were members until the time of their departure from PH.
To establish the amount of its lost profits, PH has given notice of its intention to present expert testimony from a business valuation specialist, Mr. David Yaffe. Mr. Yaffe, a Certified Public Accountant, prepared an estimate of PH's lost profits by comparing (1) the profits the Practice Group would probably have generated in 1996 and thereafter had the individual defendants remained with it and the Practice Group's billings continued to grow as they had from 1990 through 1995, with (2) the profits the Practice Group actually generated from the point of the CT Page 11656 defendants' departure through 1998, and would probably generate thereafter, through January 1, 2003, assuming that the Practice Group would have fully mitigated its damages by that time.
To estimate the profits the Practice Group would have generated had the defendants remained with it and the Practice Group continued to grow at the same rate that characterized its growth from 1990 through 1995, Mr. Yaffe used actual billings and costs data for the Practice Group for the years 1990 through 1995. Noting that in 1995, the last pre-departure year for which billings data were available, there was a sharp increase in billings due to a special contract with the Connecticut Mutual Insurance Company ("CM") that would not be renewed due to CM's impending merger with the Massachusetts Mutual Insurance Company, Mr. Yaffe reduced the billings number for 1995, then plotted a trend line among the six annual data points that, in his judgment, fairly reflected the Practice Group's true rate of growth in that six-year period.
To plot his trend line, Mr. Yaffe used the "least squares method" commonly used in linear regression analysis to plot the mathematical or statistical relationship between dependent and independent variables. By so doing, however, he does not claim to have performed a linear regression analysis, or any other type of statistical analysis of the data he examined. Nor does he claim to have established a mathematical or statistical correlation between the amount of the Practice Group's billings and the passage of time, or any other factor potentially affecting the marketplace for legal services in the relevant time frame. Instead, he simply claims that he used the least squares method to
 develop a trend. It was kind of like an internal average of the historical data to develop a trend as opposed to, say, regression analysis could be referred to more as a statistical analysis type of thing, and I really didn't do that.
10/18/01 Tr. #1 at 3.
Mr. Yaffe's purpose for plotting the trend line was to obtain a fair description of the Practice Group's recent billings history so he could use it as a tool for estimating what the Practice Group's billings would have grown to in the post-departure period had the individual defendants not left it, and its billings continued to grow at pre-departure rates.
The principal basis upon which Mr. Yaffe projected future growth of Practice Group billings was information he received from PH's Executive Director, Mr. David Urbanik. Mr. Urbanik described the period leading up CT Page 11657 to the individual defendants' departure as a growth period for the Practice Group. In that time, according to Mr. Urbanik, the Group had grown to a size and developed a sufficient base of skill and experience both to compete effectively in its regional market and to adapt effectively to changes in that market as they were experienced. Moreover, as Mr. Urbanik described it, the Practice Group was poised to enter the growing commercial mortgage-backed securities market, where it had excellent prospects for acquiring more national clients. Its potential for continued growth, as described by Mr. Urbanik, was very great indeed.
Mr. Yaffe accepted Mr. Urbanik's description of the Practice Group's size and skills base, adaptability to changing market conditions, readiness to enter the commercial mortgage-backed securities market, and resulting prospects for continued future growth as a given, never attempting to validate it in any way. As a "reasonableness" or "sanity check" on Mr. Urbanik's assumptions, however, he considered an optimistic projection of 1996 billings for the Practice Group which had been prepared by defendant Jones shortly before his departure from the PH and examined data concerning the commercial mortgage-backed securities market, both of which he found to be consistent with Mr. Urbanik's optimism.
From the billings he projected for the Practice Group had the individual defendants not left it and it continued to grow in 1996 and beyond at the same rate that fairly characterized its growth from 1990 through 1995, Mr. Yaffe used standard industry sources to compute the likely costs required to generate those billings. The difference between such costs and projected billings became Mr. Yaffe's estimate of future profits the Practice Group would have generated had the individual defendants not left PH for Dechert in the manner alleged.
To estimate the amount of PH's lost profits, Mr. Yaffe next calculated the profits the Practice Group actually generated from 1996 through 1998 and were likely to generate thereafter, through January 1, 2003 — the date by which he assumed that the Practice Group would reach the same level of billings it would by then have reached if the individual defendants had never left it. The difference between these billings and the costs required to generate them constituted the diminished post-departure profits of the Practice Group. By subtracting such profits from the profits the Practice Group would have made through January 1, 2003 had the individual defendants never left it, calculated as aforesaid by projecting the least squares trend line into the future until damages were fully mitigated, Mr. Yaffe calculated lost profits allegedly resulting from the defendants' alleged misconduct. CT Page 11658
The defendants have moved this Court in limine to exclude the testimony of Mr. Yaffe under the doctrine of State v. Porter, 241 Conn. 57 (1997). In support of their motion, the defendants have argued that Mr. Yaffe's lost profits estimate must be excluded from evidence in this case because the plaintiff has not proved, and cannot prove, that it is either "reliable" — that is, derived from a scientifically valid methodology — or demonstrably "relevant" to any contested issue in this case. In particular, the defendants challenge:
(1) the witness's use of the least squares formula to calculate the trend line for the Practice Group's billings from 1990 through 1995;
(2) the witness's ad hoc adjustment of the 1995 billings figure to account for the uncharacteristically high billings attributable to the non-renewing CM contract instead of eliminating all CM billings from the billings data from which he calculated the trend line;
(3) the witness's use of six years of billings data, modified as aforesaid, to project eight years of future billings without attempting to identify the particular market factors that accounted for the earlier billings, to correlate projected changes in such factors with projected growth of future billings, or to use standard statistical tests to validate his use of the trend line to forecast future billings; and
(4) the witness's admitted inability to correlate all or any part of the lost profits he has estimated to any particular act of misconduct of which the defendants, or any of them, are accused in this case. The defendants have supported these arguments with the testimony of Dr. James McElroy, a professor of economics, who roundly criticized the witness's use of linear regression techniques to plot a trend line and project its continuation eight years into the future without performing standard statistical tests to determine its probable accuracy as a predictor of future billings.
The plaintiff has responded to the defendants' motion in two basic ways. First, it claims that the testimony offered by Mr. Yaffe is not "scientific evidence," within the meaning of Porter, and thus cannot be excluded for failure to meet the special requirements for admissibility of scientific evidence established in that case. Indeed, claims the plaintiff, Mr. Yaffe's proffered testimony is the sort of evidence that is routinely offered and admitted through the testimony of accountants, business analysts and other non-scientists to prove lost profits — invariably without proof of its scientific validity.
Secondly, the plaintiff claims that even if all or part of Mr. Yaffe's CT Page 11659 testimony is indeed "scientific," it is admissible under Porter because it is based upon a valid forecasting technique or methodology — trend analysis of time series data — that is commonly used and generally accepted by Certified Public Accountants for the making of financial projections. Here, claims the plaintiff, it is admissible because, as limited by the purpose for which it is offered, it is demonstrably relevant to one or more issues in this case. On this score, the plaintiff claims that, although its expert, Mr. Yaffe, cannot tie any of the plaintiff's alleged lost profits to any particular act of wrongdoing by the defendants, or any of them, and cannot independently validate Mr. Urbanik's description of the Practice Group's growth potential or adaptability to the changing legal services market as of early 1996, his projection affords the jury a reasonable basis for estimating the Practice Group's lost profits as a result of the individual defendants' departure from the plaintiff to join Dechert if Mr. Urbanik's assumptions are found to be valid. In that sense, then, Mr. Yaffe offers no independent opinion as to what the Practice Group's profits would have been had the individual defendants not left it for Dechert. instead, he estimates what those profits would have been if Mr. Urbanik's assumptions about the firm's prospects and capabilities in that time frame — which he did not study or attempt to evaluate apart from conducting his "reasonableness" or "sanity check" — were indeed accurate. The connection between that opinion and other evidence in the case will ultimately be for the jury to make.
 I
In Porter, the Connecticut Supreme Court adopted a new approach for determining the admissibility of scientific evidence based on novel scientific principles or derived from innovative scientific techniques. Rejecting the pre-existing approach first articulated in Frye v. UnitedStates, 293 F. 1013 (D.C. Cir. 1923), under which the admissibility of such evidence depended upon whether or not the principle or technique underlying the evidence had gained "general acceptance in the particular field in which it belongs;" id. at 1014; the Porter Court followed the lead of the United States Supreme Court in Daubert v. Merrell DowPharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469
(1993), by ruling that the admissibility of such evidence shall henceforth
 entail [ ] a two part inquiry: "whether the reasoning or methodology underlying the [scientific theory or technique in question] is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." [Daubert, supra, CT Page 11660 509 U.S. at] 592-93. In other words, before it may be admitted, the trial judge must find that the proffered scientific evidence is both reliable and relevant.
Porter, supra 241 Conn. at 64. In Daubert, the Porter Court explained,
 The first requirement for scientific evidence to be admissible . . . is that the subject of the testimony must be scientifically valid, meaning that it is scientific knowledge routed "in the methods and procedures of science"; [Daubert, supra, 509 U.S. at] 590; and is "more than subjective belief or non-supported speculation." Id. The requirement "establishes a standard of evidentiary reliability"; id., as "[i]n a case involving scientific evidence, evidentiary reliability will be based upon scientific validity.
Porter, supra, 241 Conn. at 64. (Emphasis in original.)
"To determine if a particular theory or technique is based on scientific evidence," the Daubert Court "listed four nonexclusive factors for federal judges to consider":
 (1) whether it can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error, including the existence and maintenance of standards controlling the techniques operation; and (4) whether the technique is, in fact, generally accepted in the relevant scientific community. Id. to 593-94. The [Daubert] Court emphasized, however that the inquiry is "a flexible one. Its overarching subject is the scientific validity — and thus the evidentiary relevance and reliability — of the principles that underlie a proposed submission." Id., 594 095. Indeed, the [Daubert] Court explicitly noted that other factors "may well have merit . . . [t]o the extent that they focus on the reliability of evidence as ensured by the scientific validity of its underlying principles. . . ." Id., 594-95 n. 12.
Porter, supra, 241 Conn. at 64-65. CT Page 11661
As for the second condition that scientific evidence must satisfy to be admitted into evidence under the Daubert approach, the Porter Court observed as follows:
 It must "fit" the case in which it is presented [Daubert, supra, 509 U.S. at] 591. In other words, proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract.
Porter, supra 241 Conn. at 64.
The Porter Court adopted the Daubert approach to the admissibility of scientific evidence for Connecticut to accomplish two basic objectives. First, it sought to alleviate the conservatism of the Frye rule, which had long operated to exclude valid, potentially critical evidence merely because the reasoning or technique underlying the proffered evidence had not yet gained general acceptance in the relevant scientific community.Frye had been criticized on this basis for years, and the Porter Court agreed with the critics. Id. at 74-77.
Second, the Porter Court sought to ensure that, even as the courtroom door was being opened to relevant, reliable evidence based on scientifically valid techniques or methodologies that had not yet gained general acceptance, it would remain securely closed to irrelevant and unreliable "scientific" evidence that either did not "fit" the case in question or was not based on scientific knowledge. To guard against the admission of such potentially misleading evidence, the Porter Court agreed with Daubert that the trial judge must serve as gatekeeper to review such evidence for relevance and reliability, if it was objected to on that basis. Judges, it reasoned, were better equipped than jurors make such threshold determinations of scientific validity. Porter, supra,241 Conn. at 74.
In instructing Connecticut trial judges how to conduct admissibility inquiries as to proffered scientific evidence, the Porter Court began by reminding them that their validity assessments must focus "solely on principles and methodology, not on the conclusions that they generate."Id. at 81 (quoting Daubert, supra, 509 U.S. at 595). It thus cautioned judges not to reject proffered scientific evidence merely because they disagreed with the ultimate opinion reached by the expert, or because they knew of "other methodologies that might lead to contrary conclusions." Id. at 81-82 [Citation omitted.] "As long as the expert's methodology is well founded," the Court observed, CT Page 11662
 the nature of the expert's conclusion is generally irrelevant, even if it is controversial or unique. Id. Once the methodology underlying an expert's conclusion has been sufficiently established, the mere fact that controversy, or even substantial controversy, surrounds that conclusion goes only to the weight, and not to the admissibility, of such testimony.
Id. at 82-83.
The Court next noted that at times, the concern of the trial judge would not be that a principle or technique was scientifically invalid, but rather that its application to the case at hand was so fundamentally flawed as to deprive the expert's testimony of any scientific validity. The Court explained that trial judges should respond to such situations as follows:
 [Q]uestions about the methodological validity of proffered scientific testimony will generally go to the weight of such evidence, not to its admissibility. Courts should exclude scientific evidence, however, when such concerns render the techniques, and the resulting evidence, incapable of assisting the fact finder in a sufficiently meaningful way.
Porter, supra, 241 Conn. at 88. It carefully instructed, however, that such evidence should only be excluded if application of a "methodology that is valid in the abstract . . . [is] so flawed that, in essence, a different, invalid methodology is being applied." Id., n. 31.
The upshot of the foregoing observation is that flawed applications — even severely flawed applications — of scientifically valid techniques and methodologies should typically be admitted, not excluded, under Porter. Accordingly, the Court advised that,
 in light of the traditional policy regarding the admission of relevant evidence, "[a] judge frequently should find an expert's methodology helpful [and thus admissible] even when the judge thinks that the expert's technique has flaws sufficient to render the [expert's] conclusions inaccurate. He or she will often believe that hearing the experts testimony and CT Page 11663 assessing its flaws was an important part of assessing what conclusion was correct and may certainly still believe that a jury attempting to reach an accurate result should consider the evidence."
Id. (quoting In re Paoli R. Yard PCB Litigation, 35 F.3d 717, 744-45 (3d Cir. 1994). "A trial judge," the Court concluded, "should . . . deem scientific evidence inadmissible only when the methodology underlying such evidence is sufficiently invalid to render the evidence incapable of helping the fact finder determine a fact in dispute." Id.
As a second major note of caution to trial judges, the Porter Court underscored the teaching of Daubert that a proper inquiry into the scientific validity of an underlying principle or methodology cannot reasonably be limited to a mechanistic examination of the four nonexclusive factors listed in Daubert. Such an approach, the Court suggested, could only be taken where the principle or methodology in question has already gained general acceptance in the relevant scientific community. "[I]f a trial court determines that a scientific methodology has gained general acceptance, then the Daubert inquiry will generally end and the conclusion derived from the methodology will generally be admissible. [N. 30. . . . Evidence derived from such principles would clearly withstand a Daubert analysis, and thus may be admitted simply on a showing of relevance.]" (Emphasis in original.)
Where, by contrast, the plaintiff fails to prove that the principle or technique underlying his proffered scientific evidence has gained such general acceptance, many factors, including but not limited to the others specifically listed in Daubert, may properly be considered in the Court's determination of scientific validity. Consideration of such factors — different for every type of scientific evidence — is necessitated by the wide range of evidence that courts and commentators have treated as scientific, including "multiple regression, and estimation of economic losses in damages awards." Id. at 78 (citing Reference Manual on Scientific Evidence, J. Moore, Federal Practice (1995)). Among other factors noted by the Porter Court, in addition to those listed in Daubert, were "whether a testifying expert can present and explain the data and methodology underlying his or her scientific testimony in such a manner that the fact finder can reasonably and realistically draw its own conclusion therefrom." Porter, supra,241 Conn. at 86 (citing, inter alia, State v. Hasan, 205 Conn. 485, 491,534 A.2d 877 (1987)).
Since Porter was decided, our Supreme and Appellate Courts have had several occasions to re-examine, re-explain and re-apply its holding. of CT Page 11664 particular interest, for the purpose of this case, are the Supreme Court's decision in State v. Reid, 254 Conn. 540, 757 A.2d 482 (2000), and the Appellate Court's decision in State v. Vumback, 68 Conn. App. 313,791 A.2d 569 (2002).
In Reid, the Supreme Court was called upon to decide if the trial court had erred by admitting the testimony of a criminalist from the State Police Forensic Laboratory that hairs found on the victim's clothing were similar to known hairs taken from the defendant. By his testimony, the criminalist had described several class characteristics of hair and pointed out the presence of those characteristics in the known and unknown hair samples presented for his examination.
Considering the defendant's Porter challenge to the trial court's admission of the criminalist's testimony on grounds of unreliability and inherent subjectivity, the Supreme Court first declared that, although it had indeed adapted a new approach to determining the admissibility of scientific evidence in Porter, it had not, by so doing, "overrule[d] Connecticut precedent regarding the evidence to which such a test should apply." Reid, supra, 254 Conn. at 546. Accordingly, because the Frye test applied only to testimony derived from "innovative scientific techniques," the Court held that Porter was so limited as well.
The Reid Court thus began its discussion of the defendant's Porter
challenge by "examin[ing] the expert testimony at issue in the present case to determine whether it is of the type contemplated by Porter."Reid, supra 254 Conn. at 546. Analogizing the evidence in question to that which was admitted over a Frye objection in State v. Hasan, supra,205 Conn. at 490, the Court concluded as follows that the challenged evidence was not "scientific," and thus not subject to evaluation and possible exclusion under Porter:
 In State v. Hasan, supra, 205 Conn. 490, we upheld the admission of the testimony of a podiatrist as to the likelihood that a pair of sneakers would fit the defendant's foot. We concluded that the podiatrist's testimony was not "scientific evidence" subject to the Frye test because the podiatrist merely compared the footwear to the defendant's feet. Id., 491. Accordingly, the "jury [was] in a position to weigh the probative value of the testimony without abandoning common sense and sacrificing independent judgment to the expert's assertions based on his special skill and knowledge." Id. The testimony was not based on "obscure scientific theories'; id., 491; CT Page 11665 that had the potential to mislead jurors awed by an aura of mystic infallibility surrounding scientific techniques, experts and the fancy devices employed" (Internal quotation marks omitted.) Id., 490. Rather, the podiatrist's testimony concerned a method, the understanding of which "is accessible to the jury'; id., 491; and the value of the `expertise lay in its assistance to the jury in viewing and evaluating the evidence.' Id., 494. Although the podiatrist's skill and training were based on science, the subject to which he testified "was a matter of physical comparison rather than scientific test or experiment." Id., 490. . . .
 [The criminalist's] testimony is akin to that of the podiatrist in Hasan. Although [his] training is based in science he testified about a subject that simply required the jurors to use their own powers of observation and comparison. During his testimony, [the criminalist] displayed an enlarged photograph of one of the defendant's hairs and one of the hairs recovered from the victim's clothing as they appeared side-by-side under the comparison microscope. [The criminalist] explained to the jurors how the hairs were similar and what particular features were visible. He also drew a diagram of a hair on a courtroom blackboard. The jurors were forced to make their own determinations as to the weight they would accord to the expert testimony in the light of this photograph and their own powers of observation and comparison. The jurors were not subject to confusing or obscure scientific evidence, but were able to use the testimony to guide them in their own determination of the similarity of the two hairs.
Reid, supra, 254 Conn. at 547-48.
As an alternative basis for upholding the trial court's ruling, the Supreme Court noted in a footnote that even if Porter were applicable to microscopic hair analysis, the trial court had fully satisfied thePorter test by holding a hearing and correctly determining that the challenged analysis had gained "general acceptance in the scientific community." Reid, supra, 254 Conn. at 549 n. 3. Because of that determination, the Reid Court did not decide if Connecticut should applyDaubert to technical as well as scientific evidence, as the United States CT Page 11666 Supreme Court had done in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137,141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Reid, supra,254 Conn. at 549 n. 4.
Though the Reid Court did not purport to break new ground by its decision, it effectively transformed one of the many factors suggested in its Porter decision for assessing the validity of scientific evidence into an independent basis for not applying Porter at all. If evidence, though based on scientific knowledge, was so presented as to be "accessible" to the trier of fact, enabling the trier to weigh its probative value and apply it to the issues of the case without abandoning common sense and sacrificing independent judgment to the expert's assertions based on his special skill and knowledge," it was not subject to analysis or possible exclusion under Porter. Reid, supra,254 Conn. at 547.
Reid, in turn, was later applied by the Appellate Court to uphold the admission of other evidence deemed non-scientific in Vumback. There, an expert physician testified over objection to the common behavior of child sexual abuse victims not to report their abuse. The Court first noted that testimony is not scientific if it "concerns a method, `the understanding of which is accessible to the [trier of fact] . . . and the value of the expertise lay in its assistance to the trier of fact in viewing and evaluating the evidence." Id. It thus observed that testimony may be non-scientific under Porter even though the expert's skills and training are based on science. Id.
In the case before it, the Vumback Court ruled that the expert's testimony was not scientific because
 he did not personally examine the victim . . . [and] did not offer any opinion as to whether the victim in fact had been sexually abused. "[The] witness did not apply any scientific instrument or test to the specific evidence in the case and he did not apply any scientific test to a hypothetical question posed by the State."
Id. at 164-65 (quoting State v. Borrelli, 227 Conn. 153, 163, 629 A.2d 1105
(1993)). Accordingly, the Court concluded that his testimony simply informed the trier how children subjected to sexual abuse might act under certain circumstances, and thus its value lay in its possible assistance to the trier in viewing and evaluating the evidence on it own. Lacking the potential to mislead the trier to abandon common sense and sacrifice its independent judgment in deciding the issues before it, the testimony CT Page 11667 was not subject to analysis or possible exclusion under Porter.
Vumback, like Reid, thus considered the clarity and simplicity of expert testimony as legitimate reasons for dispensing with any Porter
inquiry altogether. More significantly, perhaps, it held that the simple imparting of scientific knowledge to the trier so that it could apply such knowledge on its own, if it chose to, to understand the evidence before it did not require scrutiny under Porter since it did not create the potential for misleading the juror by the expert's expression of an opinion.
 II
In light of the foregoing authorities, this Court must first determine if the proffered testimony of Mr. Yaffe is "scientific evidence," subject to evaluation and possible exclusion under Porter. In support of its claim that the testimony should not be evaluated under Porter, the plaintiff makes three basic arguments.
First, it contends, quite simply, that Mr. Yaffe is not a scientist, and does not claim to be a scientist. Thus, though he has undergraduate training in mathematics, he is not a mathematician; though he has some familiarity with basic statistics, he is not a statistician or an expert in statistics; and though he has experience in performing business valuations and making financial projections, he is not an economist.
Instead, Mr. Yaffe is a Certified Public Accountant, whose expertise lies in the fields of accounting, business valuation and financial forecasting. The skills and knowledge he uses in his work are technical and experiential, not scientific. He does not conduct scientific tests or experiments, or use the results of such tests or experiments in his work. Hence, his knowledge and experience, however substantial, would not cloak him with the aura of scientific infallibility if he testified at trial.
Second, any testimony Mr. Yaffe presented in this case would not be "scientific" in any sense of the word. Not only would it not be based, or claimed to be based, upon scientific knowledge, for he does not claim to have any, but it would not involve the application of scientific principles or methodologies to the facts of the case, or the expression of opinions about how such applications should be made.
Mr. Yaffe's testimony, to be sure, would involve calculations and projections, but none based upon or derived from the application of scientific principles or methodologies, innovative or otherwise, or the CT Page 11668 results of scientific tests or experiments of any kind. It would therefore involve no statement of opinion as to how scientific knowledge should be applied by the jury, or thereby tempt the jury to abandon common sense and sacrifice independent judgment in the face of his testimony. The jurors, claims the plaintiff, can readily determine for themselves whether or not the assumptions which underlie his projections and calculations are supported by the evidence.
The defendants respond to the foregoing arguments as follows. First, they point to the Porter Court's discussion of the many kinds of evidence that courts and commentators have described as "scientific," including, specifically, "multiple regression, and estimation of economic losses in damages awards." Porter, supra, 241 Conn. at 79. Implicit, they argue, in the Porter Court's specific reference to those topics is that testimony about them is always subject to evaluation under Porter.
In addition, the defendants argue that the witness's plotting of a trend line by the least squares method to characterize the Practice Group's billings from 1990 through 1995, and use of that trend line to project a straight-line increase in the Practice Group's future billings for seven years thereafter had the individual defendants not left the firm, is a novel and unjustified application of a scientific technique that has no scientific validity in this case, and defies any juror's ability to comprehend it without relying almost completely on the witness's say-so. Thus, assertedly, it is the classic sort of evidence that should be evaluated under Porter to ensure that the jury will not be misled.
As for the Porter Court's specific mention of "multiple regression, and estimation of economic losses in damages awards" as types of scientific evidence that must be evaluated for admissibility under Porter, this Court has no doubt that in many cases, just such an evaluation will be called for. Whether or not it is called for in any given case, however, will depend not on the general subject matter of the testimony but on the specific nature of the witness's statements or opinions about that subject matter. In Vumback, for example, the imparting of scientific knowledge about the typical behavior of child sexual abuse victims was treated as non-scientific evidence because it was presented as a fact that the jury could use on its own in deciding the facts of the case before it. By necessary implication from the Court's decision, however, the expression of an opinion by that same expert witness which applied that same knowledge to the facts of the case or answered a hypothetical question would have been treated as "scientific evidence" under Porter. Hence, evidence involving estimates of economic losses in damages awards is only subject to evaluation under Porter when the particular testimony offered CT Page 11669 on that subject is, by its nature, "scientific evidence."
Consistent with the view that Porter does not apply to all expert testimony concerning "estimation of economic losses in damages awards," our Supreme Court recently held that a Certified Public Accountant could competently testify on the issue of lost profits even though he was not an economist or an expert in statistical techniques such as regression analysis. Beverly Hills Concepts, Inc. v. Schatz Schatz,247 Conn. 48, 62, 717 A.2d 724 (1998). Logically, if a Certified Public Accountant can testify to lost profits projections without having special skills or training in economics or statistics, testimony about such projections is not invariably considered scientific, and thus does not always require evaluation under Porter. The Court also agrees with the plaintiff that in this case, there is no risk that Mr. Yaffe will be mistaken for a scientist. This is not because he lacks the intelligence of a scientist, or because he is not in fact an expert in his own specialized field, but because is not in fact a scientist, he does not hold himself out to be a scientist, and he does not claim to use scientific methods in his work. No jury is likely to be awed by any aura of mystic infallibility surrounding Mr. Yaffe.
It is quite another matter, however, to determine if Mr. Yaffe's proffered testimony, despite its asserted lack of any scientific basis, involves the novel application of a scientific principle or technique which may be so flawed, as used in this case, as to require evaluation, and possible exclusion of the evidence based upon it, under Porter. Here, of course, the technique in question is the least squares method commonly used in linear regression analysis to plot the mathematical or statistical relationship between dependent and independent variables. The defendants do not challenge the scientific validity of linear regression analysis, or use of the least squares method for performing that analysis. Instead, they claim that the use of that method in this case was completely inappropriate, either to plot a trend line for the Practice Group's billings from 1990 through 1995, or to later use that trend line to project the Practice Group's likely billings for the next seven years if the individual defendants remained with PH instead of moving to Dechert.
As for the witness's use of the least squares method to plot a trend line for the historical data presented to him for the years 1990 through 1995, it is quite apparent that the witness's purpose was to find a line that "fit" the available data, fairly describing the Practice Group's true rate of growth throughout that six-year period. His modification of the 1995 data point to account for the uncharacteristic billings in that year under the nonrenewing CM contract was driven by information he had CT Page 11670 received from Mr. Urbanik and his own business judgment that an accurate trend line could not be plotted if that data point were not changed.
The plotting of that line was not a mathematical or statistical exercise. Rather, it was a convenient, conservative way of drawing a line that might as well have been drawn freehand once the witness determined that a straight line could fairly describe the general pattern of growth appearing to him in the data. Denuded of any claim that the use of the least squares method to plot that trend line had any mathematical or statistical significance, testimony concerning the line or the trend it depicts does not constitute scientific evidence within the meaning ofPorter. The fairness and accuracy of that line, as a description or representation of the Practice Group's historical billings experience from 1990 through 1995, are matters that any jury can readily evaluate on their own. They can accept the line as plotted or reject it, make further modifications to the six data points examined by the witness or leave them alone, and do so with all the data considered by the witness laid before them. In short, absent any claim of higher scientific logic for the drawing of the line as Mr. Yaffe drew it, there is no risk that the jurors would accept his judgment on the matter without drawing their own conclusions.
A different problem is presented, however, by the witness's proposed use of his 1990-1995 trend line to determine the Practice Group's likely billings from 1996 until 2003 had the individual defendants remained there instead of moving to Dechert. There is no question that one of Mr. Yaffe's purposes for plotting the trend line was to help him estimate such future billings, so that based on such estimates he could calculate the plaintiff's lost profits in the wake of the individual defendants' departure. The issue presented is whether, in using the trend line for that purpose, the witness would be attempting to use past billings history as an independent predictor of future billings growth, or merely as a means measure of future billings if the jurors found, based on other evidence, that if the individual defendants did not leave PH for Dechert, the Practice Group's billings would have kept on growing indefinitely at their pre-1996 rate in and after 1996.
If the former were his claim, then Mr. Yaffe's proffered testimony would obviously be scientific evidence under Porter, for it would involve the theoretical projection or prediction of future events based upon a mathematical or statistical analysis of past and present events. Mr. Yaffe's testimony as to such a projection would not merely put scientific knowledge before the jury so they could use it, if they chose to, in deciding the issues before them. Rather, it would require an explanation of the workings of a mathematical or statistical model and the expression CT Page 11671 of an opinion as to how conclusions drawn from the model should be applied to other evidence in the case. Despite Mr. Yaffe's admitted lack of scientific expertise, such testimony would risk misleading the jurors to accept his scientific conclusions about matters they lacked the wherewithal to evaluate for themselves.
If the latter were Mr. Yaffe's claim, by contrast, his testimony would not be scientific evidence under Porter, for it would not involve the application of any scientific knowledge to proven or hypothetical facts. If the jurors were to find, based on evidence from Mr. Urbanik or others, that the Practice Group would have kept growing at its pre-1996 rate in and after 1996 had the individual defendants not left it for Dechert, they could simply use Mr. Yaffe's computations to check their math in calculating total billings that would have been generated. There is nothing obscure or difficult to grasp about testimony that simply solves a straightforward arithmetic problem.
Though the plaintiff has occasionally argued that Mr. Yaffe performed a trend analysis or a time series analysis, which is a statistical analysis designed to predict "future values of a variable based entirely on the past and present observations of that variable, [;]" Basic BusinessStatistics Concepts and Applications, Berenson, Levine and Krehbiel (8th Ed.) at 637; this Court is persuaded, for reasons cogently argued by the defendants, that he did no such thing. Not only did he not describe his own work as a time series analysis, but he failed to take even the most minimal steps required to test the statistical soundness of his work, as is universally required for the performance of a time series analysis. This, then, is not the case of a statistician who tried in vain to perform a time series analysis but fell short of the mark. Instead, it is the case of an accountant who never considered making a mathematical or statistical model of prior billings history to scientifically predict or project future billings, and thus performed no tests at all to validate his projections and lost profits estimates.
Indeed, despite the plaintiff's use of the terms "trend analysis" and "time series analysis" to describe what Mr. Yaffe did, the plaintiff made it clear at oral argument that it does not seek to introduce Mr. Yaffe's testimony to make mathematical or statistical projections or predictions of any kind. Thus, the plaintiff does not claim that the trend line he plotted does anything more than describe the Practice Group's average yearly billings from 1990 through 1995. It gives him no basis at all for predicting that Practice Group billings would have grown had the individual defendants not left PH for Dechert, much less for predicting the amounts of such future billings or the periods of time in which they would have been generated. Proof of such billings, conceded the CT Page 11672 plaintiff, would have to come from other witnesses, such as Mr. Urbanik, who would describe for the jury all of the reasons why they projected that the Practice Group would continue to grow at its pre-1996 rate in 1996 and beyond. In the end, it will be for the jury to assess the probability of future Practice Group growth, as supported by the testimony of such other witnesses and by Mr. Yaffe's own calculation of future billings on the basis of their assumptions.
Another important limitation on the testimony of Mr. Yaffe, as its purpose was explained by plaintiff's counsel in oral argument, is that he cannot tie the performance of particular wrongful acts by any of the defendants to the causation of particular amounts of damages. Mr. Yaffe offers no basis upon which to allocate responsibility among the defendants for all or any portion of the plaintiff's alleged lost profits, or for comparing the profits the plaintiff claims it lost with those it would have lost in any event had the individual defendants simply decided to work elsewhere, as was their right, without engaging in any misconduct.
Here, then, the mere fact that the witness has calculated a trend line to obtain the best fit, or internal average, among six data points for yearly billings, does not make his testimony scientific evidence. Nor does the application of the average growth rate, so calculated, to estimate the Practice Group's future billings if the growth rate continued constitute scientific evidence, for it falls short of an opinion that it will so continue — an opinion the witness cannot make without relying upon Mr. Urbanik's assumptions, which he cannot and does not attempt to independently validate. As for future billings, then, the witness can do no more than calculate what those billings would be if growth continued in 1996 and thereafter at the same rate as they grew from 1990 through 1995. Such testimony is not "scientific evidence," within the meaning of Porter, because the witness can say nothing that risks causing the jury to decide an issue in the case without exercising their own independent judgment.
 CONCLUSION
For all of these reasons, the Court concludes that the testimony of Mr. Yaffe, as limited by the purposes for which it is offered, is not subject to evaluation or possible exclusion under Porter. Accordingly, the defendants' motion in limine is hereby DENIED.
IT IS SO ORDERED this 11th day of September, 2002.
Michael R. Sheldon, J. CT Page 11673
[EDITORS' NOTE: This page is blank.] CT Page 11674